## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*, | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | |

### NOTICE OF APPEAL

Pursuant to 28 U.S.C. § 158(a) and Rules 8002 and 8004 of the Federal Rules of Bankruptcy Procedure, Central States, Southeast and Southwest Areas Pension Fund, by and through its undersigned counsel, hereby appeals the Bankruptcy Court's April 7, 2025 Memorandum Opinion (Dkt. No. 6030, hereinafter the "Opinion," attached hereto as **Exhibit A**) and the corresponding Order of July 18, 2025 (Dkt. No. 6682, hereinafter the "Order," attached hereto as **Exhibit B**). The names of the parties to the Opinion and the Order appealed from—as well as the names, addresses, and telephone numbers of their respective attorneys—are as follows:

| Party | Attorneys |
|---|---|
| *Central States, Southeast and Southwest Areas Pension Fund* | William D. Sullivan (No. 2820)<br>William A. Hazeltine (No. 3294)<br>**SULLIVAN · HAZELTINE · ALLINSON LLC**<br>919 North Market Street, Suite 420<br>Wilmington, DE 19801<br>Tel: (302) 428-8191<br>bsullivan@sha-llc.com<br>whazeltine@sha-llc.com<br><br>Brad R. Berliner, Esq.<br>Andrew J. Herink, Esq.<br>Daniel Sullivan, Esq.<br>Central States Funds<br>8647 W. Higgins Road<br>Chicago, IL 60631<br>Tel: (847) 939-2478<br>bberliner@centralstatesfunds.org<br>aherink@centralstatesfunds.org<br>dsulliva@centralstatesfunds.org |

| Party | Attorneys |
|---|---|
| *Debtors* | Laura Davis Jones, Esq.<br>Timothy P. Cairns, Esq.<br>Peter J. Keane, Esq.<br>Edward Corma, Esq.<br>Pachulski Stang Ziehl & Jones LLP<br>919 N. Market Street, 17th Floor<br>Wilmington, DE 19801<br>ljones@pszjlaw.com<br>tcairns@pszjlaw.com<br>pkeane@pszjlaw.com<br>ecorma@pszjlaw.com<br><br>Patrick J. Nash, P.C., Esq.<br>David Seligman, P.C., Esq.<br>Shirley Chan, Esq.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>333 W. Wolf Point Plaza<br>Chicago, IL 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br>pnash@kirkland.com<br>dseligman@kirkland.com<br>shirley.chan@kirkland.com<br><br>Michael Esser, Esq.<br>John Christian, Esq.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>555 California Street<br>San Francisco, CA 94104<br>Telephone: (415) 439-1400<br>Facsimile: (415) 439-1500<br>michael.esser@kirkland.com<br>john.christian@kirkland.com |
| *Teamsters Pension Trust Fund of Philadelphia & Vicinity* | Joseph H. Huston, Jr. (No. 4035)<br>STEVENS & LEE, P.C.<br>919 North Market Street, Suite 1300<br>Wilmington, DE 19801<br>Telephone:  (302) 425-3310<br>Fax:  (610) 371-7972<br>joseph.huston@stevenslee.com<br><br>John C. Kilgannon, Esquire<br>STEVENS & LEE, P.C.<br>1500 Market Street, East Tower Suite 1800 |

| Party | Attorneys |
|---|---|
|  | Philadelphia, PA 19012<br>Telephone:  (215) 751-1943<br>john.kilgannon@stevenslee.com |
| *International Brotherhood of Teamsters Local 705 Pension Fund* | William D. Sullivan (No. 2820)<br>William A. Hazeltine (No.3294)<br>SULLIVAN HAZELTINE ALLINSON LLC<br>919 North Market Street, Suite 420<br>Wilmington, DE 19801<br>Tel: (302) 428-8191<br>bsullivan@sha-llc.com<br>whazeltine@sha-llc.com<br><br>Stephen J. Rosenblat, Esq.<br>BAUM SIGMAN AUERBACH &<br>NEUMAN, LTD.<br>200 West Adams Street, Suite 1825<br>Chicago, IL 60606<br>Tel: (312) 216-2573<br>srosenblat@baumsigman.com<br><br>John S. Delnero (ARDC No. 6195914)<br>PEDERSEN HOUPT<br>161 North Clark Street, Suite 2700<br>Chicago, IL 60601<br>Tel: 312-261-2185<br>jdelnero@pedersenhoupt.com |
| *New York State Teamsters Conference Pension and Retirement Fund; Management Labor Pension Fund Local 1730; Teamsters Local 617 Pension Fund; and Trucking Employees of North Jersey Pension Fund* | William D. Sullivan (No. 2820)<br>William A. Hazeltine (No. 3294)<br>SULLIVAN HAZELTINE ALLINSON LLC<br>919 North Market Street, Suite 420<br>Wilmington, DE 19801<br>Tel: (302) 428-8191<br>bsullivan@sha-llc.com<br>whazeltine@sha-llc.com<br><br>Edward J. Meehan (*pro hac vice*)<br>Samuel I. Levin (*pro hac vice*)<br>GROOM LAW GROUP, CHARTERED<br>1701 Pennsylvania Ave., NW<br>Washington, DC 20006<br>Tel: (202) 857-0620<br>emeehan@groom.com<br>slevin@groom.com |

| Party | Attorneys |
|---|---|
| *Central Pennsylvania Teamsters Pension Fund Defined Benefit Plan; International Brotherhood of Teamsters Union No. Local 710 Pension Fund; New England Teamsters Pension Fund; Teamsters Joint Council No. 83 of Virginia Pension Fund; The holders of the claims originally held by Teamsters Local 641 Pension Plan; Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund; and Freight Drivers and Helpers 557 Pension Fund* | Mark D. Collins (No. 2981)<br>Cory D. Kandestin (No. 5025)<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>Telephone: (302) 651-7700<br>collins@rlf.com<br>kandestin@rlf.com<br><br>Dennis F. Dunne, Esq.<br>MILBANK LLP<br>55 Hudson Yards<br>New York, NY 10001<br>Telephone: (212) 530-5000<br><br>Andrew M. Leblanc, Esq.<br>Erin E. Dexter, Esq.<br>Melanie Westover Yanez, Esq.<br>Riah Kim, Esq.<br>MILBANK LLP<br>1850 K St. NW, Suite 1100<br>Washington, DC 20006<br>Telephone: (202) 835-7500<br>edexter@millbank.com |
| *MFN Partners, LP and Mobile Street Holdings, LLC* | Eric Winston, Esq.<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, CA 90017<br>Telephone: (213) 443-3000<br>ericwinston@quinnemanuel.com<br><br>Derek L. Shaffer, Esq.<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>1300 I Street NW, Suite 900<br>Washington, D.C. 20005<br>Telephone: (202) 538-8000<br>derekshaffer@quinnemanuel.com<br><br>L. Katherine Good, Esq.<br>Maria Kotsiras, Esq.<br>Potter Anderson & Corroon LLP<br>1313 N. Market Street, 6th Floor<br>Wilmington, DE 19801 |

| Party | Attorneys |
|---|---|
| | Telephone: (302) 984-6000<br>kgood@potteranderson.com<br>mkotsiras@potteranderson.com |
| *Road Carriers Local 707 Pension Fund* | Susan Bruno, Esq.<br>Cary Kane PLLC<br>1350 Broadway, Suite 1810<br>New York, NY  10018<br>Telephone: (212) 871-0540<br>sbruno@carykane.com |

Date:    August 1, 2025
        Wilmington, Delaware

**SULLIVAN · HAZELTINE · ALLINSON LLC**

*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
      whazeltine@sha-llc.com

Brad R. Berliner, Esq.
Andrew J. Herink, Esq.
Daniel Sullivan, Esq.
Central States Funds
8647 W. Higgins Road
Chicago, IL 60631
Tel: (847) 939-2478
Email: bberliner@centralstatesfunds.org
      aherink@centralstatesfunds.org
      dsulliva@centralstatesfunds.org

*Attorneys for Central States Pension Fund*

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*, | Case No. 23-11069 (CTG) |
| Debtors. | **Related Docket Nos. 4184, 5162, 5165, 5166, 5175, 5181, 5995** |

# MEMORANDUM OPINION SETTING FORTH
# PRELIMINARY OBSERVATIONS ON REMAINING
# <u>MULTIEMPLOYER PENSION PLAN CLAIMS ALLOWANCE DISPUTES</u>

# TABLE OF CONTENTS

Prefatory observations in light of April 7 Status Conference .......................... 1

Introduction ................................................................................................ 6

Procedural background ................................................................................ 9

Jurisdiction ................................................................................................ 14

Analysis ..................................................................................................... 14

I.      The debtors had not defaulted on their withdrawal liability obligations as of the petition date. ........................................... 14

II.    The debtors' 20-year stream of withdrawal liability payments were accelerated by virtue of the bankruptcy filing. ........................... 17

III.   While it appears that 29 U.S.C. § 1405(e) would operate to present value future liabilities under ERISA, the issue, even if preserved, is overtaken by the work done by the Bankruptcy Code. ...................................................................................... 19

      A.    The calculation of the (up to) 20-year payment of withdrawal liability includes the payment of interest. .............. 20

      B.    29 U.S.C. § 1405(e) seems to remove interest from the calculation of withdrawal liability when there are multiple withdrawals occasioned by a liquidation, but because the same result is required by § 502(b)(2) of the Bankruptcy Code, the Court need not resolve that question here. ............................................................... 23

IV.   Even if 29 U.S.C. § 1405(e) did not do so, under § 502(b)(2) of the Bankruptcy Code, any claim for the unmatured interest in the calculation of withdrawal liability must be disallowed. ................. 31

      A.    Under *Oakwood Homes*, disallowance of unmatured interest *is* the Bankruptcy Code's method of present valuing future claims; when future payments include unmatured interest, no further present discounting is appropriate. ................................................................... 33

      B.    Nothing in § 502(b)(2) is limited to contractual interest as agreed between the parties; the interest that is included

by virtue of actuarial assumptions under ERISA should be disallowed under § 502(b). ...................................................... 38

C.    Even for those plans whose claims are subject to the 20-year cap, withdrawal liability is calculated by dividing the total claim into principal and interest using normal principles of amortization (at the applicable interest rate) and disallowing the claim for unmatured interest under § 502(b)(2). .................................................................... 43

V.    The § 1405(b) adjustment is applied after § 1381's 20-year cap. ......... 47

A.    The debtors' § 1405(b) argument is properly preserved............. 49

B.    This Court may grant partial summary judgment on a part of the debtors' § 1405(b) claim under Rule 56. ................... 50

C.    <u>29 U.S.C. § 1405(b)</u> applies in the context of a chapter 11 liquidation. ................................................................................. 52

D.    <u>29 U.S.C. § 1405(b)</u> applies in addition to, not instead of, the 20-year cap.......................................................................... 53

    1.    The text of § 1381(b)(1) establishes the order in which the various withdrawal liability adjustments must be applied. .......................................... 56

    2.    The debtors' positions are not contrary to the law of the case. .............................................................................. 58

VI.    Central States and Local 641 used inappropriate contribution rates when calculating the debtors' withdrawal liability. ................... 60

VII.    The liquidated damages provision contemplated in the 2014 letter agreement is an unenforceable penalty under Illinois law. ....................................................................................................... 64

Conclusion ............................................................................................... 67

**Prefatory observations in light of April 7 Status Conference**

A word about the context of this unusual Memorandum Opinion is probably necessary. The most logical place to start is with this Court's March 31, 2025 Letter Opinion.[1] In short, the debtors and MFN had filed objections to proofs of claim filed by various multiemployer pension plans.[2] Various parties sought summary judgment on claims allowance issues. The Court heard argument on those motions on January 28, 2025 and was in the process of finalizing its opinion. Before the Court issued the opinion, however, the debtors and the Committee asked the Court to withhold the opinion.[3] The reason was that they would be filing a joint plan (which they have since filed) under which they would settle those claims objections. Issuing the opinion, they argued, would massively disrupt the hard work of many parties in reaching that settlement. MFN, which had joined in the claims objections and was not part of the settlement, took the view that it was entitled to a resolution of its claims objections, and thus asked the Court to go ahead and issue its opinion.

What should a court do in that situation? That was the subject of the March 31 Letter Opinion, which addressed the correspondence received from the parties. The opinion addressed three different approaches courts had taken when a trustee or debtor-in-possession seeks to settle a claim to which another party in interest had objected. One line of cases suggests that a bankruptcy court can essentially ignore

---

[1] That Letter Opinion is docketed at D.I. 5999.

[2] Debtor Yellow Corporation and its various debtor affiliates are referred to as "debtors" or "Yellow." MFN Partners and its various affiliates, which collectively hold both debt and equity of the debtors' are referred to (collectively) as "MFN."

[3] The Official Committee of Unsecured Creditors is referred to as the "Committee."

the claim objection and simply resolve the motion under the typical, highly deferential standard applicable under Rule 9019.[4]  Another line of cases suggests that the party that has filed a claim objection is entitled to an adjudication of that objection, and that a debtor cannot settle the claim in a way that would deprive the objecting party of that statutory right.[5]  And a third opinion suggests that courts should seek to find a middle ground that harmonizes the right of any party in interest to object to the allowance of claim with the trustee's authority, as a fiduciary, to resolve disputes in a manner that the trustee believes is in the estate's best interest.[6]

In its March 31 Letter Opinion, the Court concluded that the *Kaiser Aluminum* approach (under which a settlement could be approved so long as it fell anywhere within a range of reasonable settlements) was essentially foreclosed by subsequent precedent, and suggested that regardless of whether it would adopt the approach set out in *C.P. Hall* or the "goldilocks" approach suggested in *DVR*, it would make sense to issue its opinion so that the parties could move forward with an understanding of the Court's analysis of the issues that bear on claims allowance.  But out of respect for the hard work of the parties in forging a settlement reflected in a proposed plan, the Court indicated that it would give the parties the opportunity to be heard on the issue at a status conference on April 7, 2025 before issuing the opinion.

---

[4] *See In re Kaiser Aluminum Corp.*, 339 B.R., 91 (D. Del. 2006).

[5] *See In re C.P. Hall Co.*, 513 B.R. 540, 542 (Bankr. N.D. Ill. 2014).

[6] *In re DVR, LLC*, 582 B.R. 507 (Bankr. D. Colo. 2018).

That status conference was constructive. With respect to the ultimate standard the Court will apply to determine whether the settlements may be approved, the Court remains open to the suggestion set forth in the *DVR* opinion that Rule 9019 and § 502(b) can be harmonized. Such an approach would meet the requirement of § 502(b) by deciding to allow the claim in the amount set forth in the settlement. But in recognition of the rights of the party that had objected the claim's allowance, the Court would not apply the highly deferential standard that otherwise applies under Rule 9019. Rather, the debtor would need to demonstrate that the settlement was at least in the same zip code (for want of a more precise formulation) as the outcome that would be reached if the claim objection were fully considered on its merits. Under this approach, a court could perhaps account for the practical concerns raised by the court in *Kaiser Aluminum* by treating a claim objection that was promptly filed differently from one that was filed *after* a 9019 motion in an effort by the objecting party simply to gum up the works and obtain leverage.

The Court also remains open to the analysis set out in *C.P. Hall*. Resolving that question is ultimately an issue for confirmation that need not be tackled today. But a meaningful point of consensus emerged during the April 7 status conference. In light of the Court's determination that it was going to apply meaningful scrutiny to the proposed settlement, which scrutiny would be informed by the conclusions the Court had reached on the summary judgment motions, all parties agreed that, even if the Court were not to resolve claims allowance separately, the confirmation process would be better served if the Court were prepared to set forth those views in advance

3

of the confirmation hearing. Alternatively, if the Court ultimately adopts the approach set forth in *C.P. Hall*, it would be free at that time to enter partial summary in the claims allowance dispute in a way that gives effect to those conclusions. And all of parties agreed that, however the Court might ultimately resolve the question, the issuance of preliminary observations would permit continued discussions among the parties and allow them to form considered judgments about how to proceed with respect to confirmation with greater visibility into the target at which they will be shooting.

The Court's only hesitation is that even in circumstances in which the issuance of an advisory opinion might be helpful to the parties, federal courts lack the authority to provide them. Rather, under Article III of the Constitution, the judicial power is limited to resolving actual "Cases [and] Controversies."[7] And as *Marbury* explains, the power of the "judicial department to say what the law is" is merely incidental to the duty to "apply the rule to particular cases."[8]

The Court is satisfied, however, that it may repurpose what was previously a draft opinion resolving the summary judgment motions as "preliminary observations" without running afoul of this principle. The Court has before it the pending motions for summary judgment as well as the plan filed by the debtors and the Committee. These are undoubtedly concrete disputes. The process of resolving such disputes is at times iterative. Courts will ask questions of counsel at argument in ways that

---

[7] U.S. Const, Art. III, Sec. 2, Clause 1.

[8] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

reflect the judge's thinking.  To facilitate that process, this Court has at times (as have many others) offered its "preliminary observations" on an issue, in writing before the argument.  The point of doing so is to permit counsel the opportunity to be prepared to respond to and address the Court's concerns at argument.  To be sure, the preliminary views set forth in this Memorandum Opinion have baked for longer than those the Court typically sets out as "preliminary observations" in advance of an argument.  But the principle is the same.  If the Court ultimately concludes that it is required to resolve the pending motions for summary judgment, the views set forth herein represent the Court's reactions to the briefing and argument, and the Court would expect they would be incorporated into any judgment it would ultimately issue with respect to the allowance of the underlying proofs of claim.  And if the Court concludes that it need not resolve those claims allowance disputes prior to confirmation, these observations are intended to guide the parties so that they may effectively address the Court's concerns with respect to the reasonableness of the settlements reflected in the plan.  In that event, the Court would expect to incorporate these views into any decision it may ultimately issue with respect to whether the plan can be confirmed.  This Court is satisfied that it may proceed to resolve the disputes before it in such an iterative manner without running afoul of Article III.

The opinion below accordingly reflects this Court's preliminary observations on the pending motions for summary judgment in the claims allowance dispute now pending before the Court.  As discussed at the April 7 status conference, after the parties have had the opportunity to consider these views, the Court is prepared to

5

hold a further status conference for the purpose of addressing how to proceed in these cases in light of these points.

## Introduction

This Court has now issued several opinions involving the claims held by various multiemployer pension plans for withdrawal liability arising out of Yellow Corporation's withdrawal from those plans. Outside of bankruptcy, ERISA provides that an employer that withdraws from a multiemployer pension plan may pay its withdrawal liability over time. To oversimplify, the annual payment is set at a level that approximates the employer's typical annual payments to the plan. And ERISA caps the total withdrawal liability exposure at 20 years' worth of payments.

So what happens when the employer files for bankruptcy? This Court's prior opinions, while not resolving the issue, have engaged questions such as whether the obligation might have been properly accelerated before the petition date, whether *ipso facto* provisions providing for acceleration upon a bankruptcy filing are enforceable, and how one should think about present discounting the future stream of payments set forth under ERISA.

With the benefit of extensive briefing by the parties on these and other issues, the Court now concludes that several of these questions can be readily resolved through the straightforward application of first principles of bankruptcy law.[9]

---

[9] The motions for summary judgment now before the Court have been filed by the Local 705 Pension Fund ("Local 705") [D.I. 4184]; Teamsters Pension Trust Fund of Philadelphia & Vicinity (the "Philadelphia Plan") [D.I. 5162]; New York State Teamsters Conference Pension and Retirement Fund, Road Carriers Local 707 Pension Fund, Management Labor Pension Fund Local 1730, Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity

Bankruptcy itself operates to accelerate obligations that would otherwise come due in the future. That is the rule of *Sexton v. Dreyfus* and remains a foundational bankruptcy principle.[10] And so while the Court will also address (in Part I) the logically antecedent question of whether the obligations had been accelerated before the bankruptcy filing, that issue turns out to be of no consequence, as (for the reasons described in Part II) bankruptcy itself operates as an acceleration.

Even so, one must still address the question of what value to place today on an obligation that would not otherwise be due until years in the future. The parties offer competing approaches to this question of "present discounting," which is the reason the question whether the liability had been accelerated before the petition date might have made a difference. In the Court's view, the Bankruptcy Code directly answers the question of how one present discounts a claim for liability that would, absent the acceleration caused by the bankruptcy itself, otherwise mature in the future.

Section 502(b)(2) of the Bankruptcy Code provides that claims for unmatured interest are to be disallowed. And as described below, the disallowance of unmatured interest itself operates to present discount the stream of payments. The task of

---

Fund, Teamsters Local 617 Pension Fund, Trucking Employees of North Jersey Pension Fund, and Freight Drives and Helpers 557 Pension Fund (the "Multiemployer Pension Plans") [D.I. 5165]; Central States, Southeast and Southwest Areas Pension Fund ("Central States") [D.I. 5166]; Central Pennsylvania Teamsters Pension Fund Defined Benefit Plan, International Brotherhood of Teamsters Union No. Local 710 Pension Fund, New England Teamsters Pension Fund, Teamsters Joint Council No. 83 of Virginia Pension Fund, the holders of the claims originally held by Teamsters Local 641 Pension Plan [D.I. 5175]; and the debtors [D.I. 5181]. MFN filed joinders to the debtors' summary judgment and subsequent replies in support at D.I. 5182 and D.I. 5492.

[10] [219 U.S. 339](#) (1911).

separating principal from interest may be simple enough when a schedule of future payments contains an express interest rate, such as in an ordinary commercial loan. But other times (such as here) the interest rate may be implicit in a schedule of future payments and therefore less obvious. Whether the interest is express or implied, however, the exercise required by the Bankruptcy Code is the same. One must identify the portion of the obligation that is unmatured interest and disallow that portion of the claim. That conclusion (set out in Part IV) also overtakes the perhaps antecedent question (addressed in Part III) whether a separate provision of ERISA would provide for present discounting. But Part III explains that the Court reads 29 U.S.C. § 1405(e) to limit an employer's total withdrawal liability, in cases of withdrawals occasioned by a sale or liquidation, to the present value of that liability. That conclusion does affect certain of the Court's determinations in Part IV regarding the allocation between principal and interests under ERISA.

Finally, the parties have also presented three additional questions: two arising under ERISA and one under state law. The Court concludes in Part V that the cap on withdrawal liability imposed by § 1405(b) of title 29 applies *after* the application of the 20-year cap provided in 29 U.S.C. § 1399(c)(1)(B). Part VI addresses whether, under ERISA, certain plans used the appropriate "contribution base units" when calculating the debtors' annual payment. The Court concludes that they did not. And Part VII concludes that the liquidated damages provision in Central States' Guarantee of Continued Participation is a penalty clause that is unenforceable under Illinois law.

8

## Procedural background

Early in this bankruptcy case, various multiemployer pension plans sought relief from the automatic stay to have their disputes over Yellow's withdrawal liability resolved in arbitration. This Court denied those motions.[11] Instead, the Court concluded that the disputes were properly resolved in this Court, through the claims allowance process. And over the past year, the Court has issued several rulings that bear on the calculation of that withdrawal liability. This Memorandum Opinion is the latest installment in that series. The parties have filed motions for summary judgment that present seven issues involving questions under ERISA, bankruptcy law, and Illinois contract law.

A brief reprise of the history of this litigation, in addition to providing context for the disputes now before the Court, is probably necessary to make the discussion of the rather technical questions presented in these motions comprehensible to the typical reader. After the Court concluded that these issues should be resolved through the claims allowance process, the first substantive dispute presented by the parties was primarily focused on the validity of certain PBGC regulations regarding the calculation of withdrawal liability for those pension plans that received federal funds under the American Rescue Plan Act.

In 2021, Congress poured tens of billions of dollars into faltering multiemployer pension plans to provide security for retirees who count on their pensions to provide for their retirements. The PBGC regulations sought to ensure

---

[11] D.I. 2765.

that those federal funds would operate to benefit the pension plans rather than to relieve employers who withdraw from such plans of the withdrawal liability they would otherwise owe. The debtors and other parties in the bankruptcy case challenged those regulations on the ground that they conflicted with the relevant statute. In a Memorandum Opinion issued in September 2024, this Court rejected those challenges.[12]

The final few pages of that Memorandum Opinion addressed a handful of other issues presented by the parties that bear on the calculation of withdrawal liability claims. There, the Court held that: (a) ERISA's 20-year cap on withdrawal liability claims applied to the claims asserted by the pension plans; (b) the debtors' liability had been accelerated on account of their "default"; and (c) the debtors could be held to certain contractual agreements they had reached in which certain pension plans were permitted to use higher "contribution rates" than would otherwise apply under ERISA.[13]

As to the second of those issues, the term "default" is in scare quotes because it turns out that the Court erred in finding that the debtors had defaulted. The September 2024 Memorandum Opinion correctly explained that only a default under the 20-year obligation to pay withdrawal liability, not a default under the employer's regular obligation to fund the pension plans, would accelerate the remaining

---

[12] D.I. 4326.

[13] *Id.* at 34-41.

withdrawal liability obligations.[14]   But the Court failed to appreciate that the "default" the plans were referencing as the basis for their claim of acceleration was the debtors' failure to make timely payment of its regular obligation to pay pension benefits in July 2023.[15]

On the debtors' motion for reconsideration, the Court acknowledged its error and amended its September 2024 Memorandum Opinion.[16]   The order granting reconsideration (issued in November 2024) pointed out that on the summary judgment record then before the Court, there was no basis to determine whether the debtors had defaulted, as of the petition date, on their 20-year obligation to pay withdrawal liability.  The Court noted that this gave rise to a series of questions that would need to be addressed to resolve the claims allowance dispute.[17]   In substance, those questions boil down to the following:

(1)   Whether, prepetition, any of the plans declared a default and accelerated the debtors' withdrawal liability?

(2)   If the plans did not declare a default prepetition,

---

[14] *Id.* at 37-38.

[15] That default plays a key role in a different subplot of this bankruptcy case.  That missed payment triggered the Teamsters' strike notice, which in turn precipitated the failure of the debtors' business.  That issue is discussed at length in this Court's Memorandum Opinion following the trial on the WARN Act claims that were asserted against the debtors.  *See* D.I. 5807.

[16] D.I. 4769.  The Court also posted a redline showing the changes to its opinion upon the motion for reconsideration.  D.I. 4770.

[17] D.I. 4771 at 5-8.

a. Whether the plans had the authority to declare an insecurity default under 29 U.S.C. § 1399(c)(5)(B) as a result of the debtors' bankruptcy filing; and

b. If so, whether a provision that would permit them to do so would be a prohibited *ipso facto* clause under the Bankruptcy Code.

(3) Whether, if applicable, an accelerated stream of payments should be discounted to present value?  And, relatedly, whether withdrawal liability contemplates some implied interest (as opposed to being interest free)?

(4) And, finally, if the stream of payments should be discounted to present value, what is the appropriate discount rate?[18]

Certain creditors and equity holders also moved for reconsideration of the Court's decision upholding the validity of the PBGC regulations.  The Court denied that motion.[19]

On December 12, 2024, the Court entered an agreed order that established a briefing schedule and set a January 28, 2025 argument date for summary judgment motions addressed to the issues described above, as well as any other issues related

---

[18] *Id.*

[19] D.I. 4846.  The Court later granted a motion to certify this dispute for direct appeal to the Third Circuit.  D.I. 5358.  The Third Circuit has granted leave to appeal and ordered expedited briefing.  *See In re Yellow Corp.*, Third Cir. No. 25-8004 (Feb. 28, 2025), D.I. 25.

to withdrawal liability claims that were amenable to resolution on summary judgment.[20]

The parties' summary judgment motions presented the following seven issues for resolution:

(1)    Whether, as of the petition date, the debtors' obligation to pay withdrawal liability over 20 years had been accelerated as a result of a default.

(2)    Whether the debtors' 20-year stream of payments is accelerated because of their bankruptcy filing.

(3)    Whether that stream of future obligations should be discounted to present value on account of 29 U.S.C. § 1405(e).

(4)    Whether, under federal bankruptcy law, the 20-year stream of payments should be present discounted, and if so, what discount rate should be used for that purpose.

(5)    Whether the limitation on withdrawal liability set forth in 29 U.S.C. § 1405(b) applies to the employer's total share of the plan's unfunded vested benefits, or only the amount after the application of the 20-year cap provided in 29 U.S.C. § 1399(c)(1)(B).

(6)    Whether Central States and Local 641 used appropriate contribution base units when calculating the debtors' annual payment.

---

[20] D.I. 5156.  This Court also separately addressed several issues bearing on the calculation of withdrawal liability claims asserted by those plans that did not receive federal financial assistance in a Memorandum Opinion issued in February 2025.  *See* D.I. 5619.

     (7)    Whether Central States' claim arising under a side letter between the parties is properly enforceable under applicable non-bankruptcy law.

The Court has undertaken, below, to answer each of the legal questions raised by the parties.

## Jurisdiction

The pending motions for summary judgment arise in the context of claims allowance disputes. These issues arise under § 502 of the Bankruptcy Code and are therefore within the district court's "arising under" jurisdiction provided in 28 U.S.C. § 1334(b). Alternatively, the views set forth herein may bear on the confirmability of the proposed plan, which is also a matter that arises under the Bankruptcy Code and is within the district court's subject-matter jurisdiction for the same reason. In either case, these matters have been referred to this Court under 28 U.S.C. § 157(a) and the district court's February 29, 2012 standing order of reference. Claims allowance disputes are core matters under 28 U.S.C. § 157(b)(2)(B); plan confirmation matters are core matters under 28 U.S.C. § 157(b)(2)(L).

## Analysis

## I.  The debtors had not defaulted on their withdrawal liability obligations as of the petition date.

Earlier in this case, the Court proceeded on the assumption (with which the parties appeared to agree) that it mattered whether the debtors had defaulted prepetition on their withdrawal liability obligations. The reasoning was that if the debtors had *not* defaulted, then as of the petition date they would owe a 20-year stream of payments, in which case the claims would be subject to present discounting.

By contrast, if the debtors had defaulted prepetition, then as of the petition date they would owe an already-accelerated lump sum amount, in which case there would be no reason to present discount it.

And even if the debtors had not defaulted as of the petition date, many of the plans contended that the debtors' bankruptcy filing operated as an "insecurity default" that accelerated the withdrawal liabilities. If that were true, it would then give rise to the question whether such an *ipso facto* provision in a prepetition agreement is enforceable in the context of claims allowance. As opposed to the various specific contexts in which the Bankruptcy Code expressly provides that *ipso facto* clauses are unenforceable, the Code contains no express provision prohibiting the enforcement of *ipso facto* clauses in the context of claims allowance.[21]

As further described in Part II, the Court has concluded that the assumption underlying that presentation of the question was incorrect. A bankruptcy filing necessarily operates to accelerate a future stream of payments to the petition date. That still leaves the question of whether and how one present discounts that stream of future liabilities, an issue addressed in Part III (under ERISA) and Part IV (under the Bankruptcy Code). But the conclusion that bankruptcy operates as an acceleration largely overtakes the question whether the debtors' withdrawal liability had or had not been accelerated under non-bankruptcy law as of the petition date as well as the question whether the plans were entitled to declare a default and accelerate the liability as a result of the bankruptcy filing.

---

[21] *See generally* <u>11 U.S.C. §§ 363(l)</u>, <u>363(e)(1)</u>; <u>541(c)(1)(b)</u>.

But simply for the sake of completeness, the debtors' withdrawal liability had not (other than by operation of the bankruptcy filing itself) been accelerated as of the petition date. The debtors' motion for summary judgment explains that some but not all of the pension plans had the right, under the plan terms, to declare an "insecurity default" on the 20-year stream of payments on account of the debtors' bankruptcy filing.[22] Even if such an *ipso facto* provision would be enforceable, none of the pension plans point to anything in the summary judgment record to suggest that any of the plans' documents provide for an *automatic* acceleration upon a bankruptcy filing.[23] At most, certain of the plans point to provisions under which the plan would be entitled to *declare* an "insecurity default" upon the initiation of bankruptcy proceedings.[24] But there is nothing in the summary judgment record to suggest that any plan in fact had done so before the bankruptcy filing. Indeed, the record suggests that the plans generally did not even determine the debtors' withdrawal liability until they filed their proofs of claim, well after the petition date. The Court accordingly concludes that the debtors' withdrawal liability had not been accelerated, under any principle of non-bankruptcy law, prior to the petition date. And because (as discussed

---

[22] D.I. 5181 at 21-28.

[23] The plans claim that the Trucking Employees of North Jersey Welfare Fund's plan documents contain an automatically triggering insecurity default provision. D.I. 5165 at 5. But that is not the case. Under the New Jersey Welfare Fund's plan document, "the Trustees *may* require immediate payment of [a withdrawing employer's withdrawal liability]" if there is an event "which indicates a substantial likelihood that an Employer will be unable to pay its withdrawal liability." D.I. 5165-3 at 4 (emphasis added). A separate withdrawal liability policy issued by the New Jersey Welfare Fund also has language requiring the plan's trustees to take *affirmative* steps to declare an insecurity default. D.I. 5165-4 at 14-15.

[24] *See, e.g.,* D.I. 5165 at 5-6.

in Part II) the bankruptcy itself operates as an acceleration, it makes no difference whether any of the plans had validly acted to cause an acceleration on a postpetition basis.

## II.   The debtors' 20-year stream of withdrawal liability payments were accelerated by virtue of the bankruptcy filing.

The debtors' bankruptcy filing did, however, operate to accelerate their withdrawal liability obligations, which would otherwise have been payable over 20 years.  Section 502(b) of the Bankruptcy Code provides that when a proof of claim has been objected to, the court "shall determine the amount of such claim … as of the date of the filing of the petition, and shall allow such claim in such amount."[25]  Under the principle of *Sexton v. Dreyfus*, this language operates to accelerate all of the debtors' liability to the petition date.  The Third Circuit explained that point in a recent decision:

> Bankruptcy law generally presumes that the petition date "fixes the moment when the affairs of the bankrupt are supposed to be wound up." *Sexton v. Dreyfus*, 219 U.S. 339 (1911) (Holmes, J.); *see also* Douglas G. Baird, *The Elements of Bankruptcy* 84 (7th ed. 2022) (explaining that a key concept underlying the Bankruptcy Code is that, as of the petition date, each creditor's non-bankruptcy right to the debtor's estate is "transformed" into a bankruptcy claim)….  "[T]he petition date is, in essence, a 'day of reckoning,' consolidating the debtors' present and future obligations into one moment for prompt resolution."[26]

Indeed, the Third Circuit had made largely the same point in *In re Oakwood Homes Corp.*, where it noted that the "general rule of both the Bankruptcy Code and

---

[25] 11 U.S.C. § 502(b).

[26] *In re Promise Healthcare Group, LLC*, No. 24-2159, 2025 WL 666366, *4 (3d Cir. Mar. 3, 2025) (omitting citation to decision below).

§ 502(b) … is acceleration to the date of the filing of the bankruptcy petition."[27]  As the court explained, the "legislative history shows that § 502(b) and (b)(2) reflect the basic bankruptcy law tenet that 'bankruptcy operates as the acceleration of the principal amount of all claims against the debtor.' 'Simply stated, the filing of a petition accelerates the principal amount of all unmatured claims against the debtor, *whether or not* a clause in a prepetition agreement provides that a bankruptcy filing accelerates the maturity date.'"[28]

None of the foregoing ought to be terribly surprising and it is largely common ground among the parties.[29]  The debtors' prepetition withdrawal from their multiemployer pension plans gave rise to withdrawal liability under ERISA.  As described above, outside of bankruptcy that liability would be payable over a period that could be as long as 20 years.  In bankruptcy, each of the plans is entitled to an allowed claim in a lump sum amount.  Accordingly, the principal task is how to translate a series of payments that would otherwise run forward over 20 years into a single lump sum allowed claim as of the petition date.  Part III addresses whether 29 U.S.C. § 1405(e), a provision of ERISA, does any of that work.  And while the Court's tentative conclusion is that § 1405(e) *does* appear to require the present valuing of withdrawal liability claims (at least in the aggregate), the Court need not

---

[27] *In re Oakwood Homes*, 449 F.3d 588, 602 (3d Cir. 2006).

[28] *Id.* at 620 n. 19 (quoting H.R.Rep. No. 95–595, at 352–54, and 4 *Collier on Bankruptcy* ¶ 502.03, respectively) (emphasis in quotation from *Collier* added by the *Oakwood Homes* court).

[29] If anything, the fact that the bankruptcy filing itself operates to accelerate liabilities that otherwise mature in the future may explain why Congress did not think it necessary to include, in § 502, language that would prohibit the enforcement of *ipso facto* clauses.

and would not rest its holding on that basis, because it concludes in Part IV that the Bankruptcy Code would require such present discounting (through the disallowance of claims for unmatured interest) in any event.

**III.   While it appears that 29 U.S.C. § 1405(e) would operate to present value future liabilities under ERISA, the issue, even if preserved, is overtaken by the work done by the Bankruptcy Code.**

Section 1405(e) addresses particular issues that arise in "the case of one or more withdrawals of an employer attributable to the same sale, liquidation, or dissolution," circumstances that appear to be present here.[30]  It is far from clear that the debtors have properly preserved an objection to the allowance of the plans' claims based on this section.  The debtors raise it not in connection with their own motion for summary judgment, but only in opposition to the plans' motions.  It is by no means obvious that it would be appropriate to grant relief in the debtors' favor based on an argument they make only in an opposition.

As further described below, as a substantive matter § 1405(e) appears to do two principal things.  The first is to cap the debtors' total liability at the present discounted value of that liability.  For the reasons described in Part IV, this Court concludes that the Bankruptcy Code does the same thing through the disallowance of unmatured interest.  The second is to shift the *allocation* of the *total* withdrawal liability an employer owes among the various plans that have claims arising out of the withdrawal.  Critically for present purposes, the debtors are not asking for relief

---

[30] Central States disputes that proposition.  *See* D.I. 5169 at 12-13, D.I. 5460 at 8.  In light of the Court's determination that it need not rely on § 1405(e), it need not resolve that dispute.

that involves the reallocation of withdrawal liability claims *among* the pension plans. The Court accordingly is disinclined to take up the issue of how § 1405(e) might require a reallocation of withdrawal liability across the various pension plans. In this Part, however, the Court explains (in Part III.A) that the calculation of withdrawal liability under ERISA does include an interest component, and then (in Part III.B) how § 1405(e) operates to remove that interest component in cases of a withdrawal caused by a sale or liquidation.

### A.    The calculation of the (up to) 20-year payment of withdrawal liability includes the payment of interest.

To make sense of the arguments advanced by the parties with respect to 29 U.S.C. § 1405(e), it is probably necessary to back up and address the role of interest rates in the calculation of withdrawal liability. As the Court explained in its February 2025 Memorandum Opinion, the calculation of withdrawal liability requires plan actuaries to estimate the anticipated return on the plan's current assets.[31] Under ERISA, the rate of return that the actuary uses for this purpose must take "into account the experience of the plan" to produce a figure that reflects the "actuary's best estimate of anticipated experience under the plan."[32] This Court's February 2025 Memorandum Opinion held that the rate used for this purpose must approximate the rate it uses for calculating minimum funding.[33]

---

[31] D.I. 5619.

[32] 29 U.S.C. § 1393(a).

[33] D.I. 5619 at 5-20.

As it turns out, that same rate of return (which the Supreme Court, in the passage below, refers to as an interest rate) is also built into the (up to) 20-year period for paying withdrawal liability. The Supreme Court's decision in *Joseph Schlitz* explains the process of calculating withdrawal liability when it is to be paid out in installments that run for up to 20 years:

> The statutory method is unusual in that the statute does not ask the question that a mortgage borrower would normally ask, namely, what is the amount of each of my monthly payments? What size monthly payment will amortize, say, a 7% 30–year loan of $100,000? Rather, the statute fixes the amount of each payment and asks how many such payments there will have to be. To put the matter more precisely, (1) the statute fixes the amount of each annual payment at a level that (roughly speaking) equals the withdrawing employer's typical contribution in earlier years; (2) *it sets an interest rate, equal to the rate the plan normally uses for its calculations*; and (3) it then asks how many such annual payments it will take to "amortize" the withdrawal charge at that interest rate.[34]

As discussed elsewhere, § 1399(c)(1)(B) provides that if it will take more than 20 such payments to amortize the withdrawal charge, the withdrawal liability is "limited to the first 20 annual payments."[35] But for current purposes, the relevant point is that the second step in the process, as described by the Supreme Court (in italics above), is the setting of an interest rate, which is (in the Supreme Court's words) "the rate the plan normally uses for its calculations."[36] Indeed, 29 U.S.C. § 1399(c)(1)(A)(ii) explains that the assumptions used in setting the amortization period are to be the same as those "used for the most recent actuarial

---

[34] *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 418-419 (1995) (emphasis added).

[35] 29 U.S.C. § 1399(c)(1)(B).

[36] *Joseph Schlitz,* 513 U.S. at 419.

valuation for the plan" – which is another way of saying that in calculating the (up to) 20-year payment period, the plan should set an interest rate that is the same rate used for calculating minimum funding.[37]  The punchline for current purposes, then, is that the debtors' 20-year stream of withdrawal liability obligations may properly include interest at the same rate the plans use to determine minimum funding.[38]

In addition, the Supreme Court opinion in the *Joseph Schlitz* case makes another point about the calculation of withdrawal liability that is important to an issue addressed in Part IV.C of this Memorandum Opinion, but is logically mentioned here in connection with how, under ERISA, withdrawal liability obligations include an interest component.

After the passage block quoted above, the Court suggested that the question posed by ERISA is "[h]ow many annual payments of [the annual payment amount] does it take to pay off a debt of [the employer's share of the plan's unfunded vested benefits] if the interest rate is [the rate used to calculate minimum funding]?"[39]  It then observed that the "practical effect" of calculating withdrawal liability in this

---

[37] *Id.* § 1399(c)(1)(A)(ii).

[38] For this reason, the suggestion that the Court offered from the bench during an October 2024 hearing – that perhaps "what … ERISA does … is it provides for an interest-free loan" – was incorrect.  *See* Oct. 28, 2024 Hr'g Tr. at 10.  The Court apologizes for introducing this confusion.

[39] *Joseph Schlitz*, <u>513 U.S. at 419</u>.  Note that, as this this Court described in a separate opinion, the annual payment amount is calculated by "multiplying (x) the highest contribution rate in the prior ten years times (y) the highest average number of contribution base units over three consecutive plan years within the 10-year withdrawal liability period." *See* D.I. 5619 at 21.  The *Joseph Schlitz* Court simplified this point by describing the annual payment as being "at a level that (roughly speaking) equals the withdrawing employer's typical contribution in earlier years."  <u>513 U.S. at 418</u>.

manner "is that any amortization interest [the statute] may cause to accrue is added at the end of the payment schedule (unless forgiven by [the application of the 20-year cap])."[40]   Later in the opinion, the Court echoed this observation about ERISA providing for interest payments to be tacked on at the end, commenting that to the extent that ERISA's 20-year cap becomes applicable, "the presence or absence of withdrawal-year interest ... will make no difference" because "the last payments will never be made."[41]   For the reasons that will be described in Part IV.C, the Court concludes that these statements about interest being tacked on at the end of the payment period are not applicable here in light of the directions, set forth both in 29 U.S.C. § 1405(e) and in § 502(b)(2) of the Bankruptcy Code, to present value the claims by removing all applicable unmatured interest.

   B.   **29 U.S.C. § 1405(e) seems to remove interest from the calculation of withdrawal liability when there are multiple withdrawals occasioned by a liquidation, but because the same result is required by § 502(b)(2) of the Bankruptcy Code, the Court need not resolve that question here.**

   Various provisions of 29 U.S.C. § 1405 cap the amount of withdrawal liability imposed when an employer sells its business, is subject to a liquidation or dissolution, or becomes insolvent.[42]   While the text does not say so expressly, and the Court is not aware of legislative history that speaks to the issue, the statutory context suggests that the most likely purpose of § 1405's various caps would be to prevent an

---

[40] *Joseph Schlitz*, 513 U.S. at 419.

[41] *Id.* at 426.

[42] *See* 29 U.S.C. § 1405(a) (imposing caps on withdrawal liability when employer sells assets *outside* of a formal insolvency proceeding); *id.* § 1405(b) (imposing caps on withdrawal liability when an insolvent employer is undergoing dissolution or liquidation).

employer's withdrawal liability to its pension plans from unduly diluting the claims that other legitimate creditors may have against the employer.

After the previous subsections of 29 U.S.C. § 1405 impose those caps, the last subsection, § 1405(e), does something rather interesting, which does not appear to be addressed in any judicial opinion in the 45 years it has been on the books. To begin with the language, it provides that when an employer withdraws from multiple plans as a result of "the same sale, liquidation, or dissolution," then:

(1) all such withdrawals shall be treated as a single withdrawal for the purpose of applying this section, and

(2) the withdrawal liability of the employer to each plan shall be an amount which bears the same ratio to the present value of the withdrawal liability payments to all plans (after the application of the preceding provisions of this section) as the withdrawal liability of the employer to such plan (determined without regard to this section) bears to the withdrawal liability of the employer to all such plans (determined without regard to this section).[43]

The second part of this subsection is certainly a mouthful. In substance, creates an equation that can be used to calculate the withdrawal liability owed to a particular plan (which will be denoted as X), in which the ratio between the liability to *that* plan and the *present value* of the liability to all plans (Y) is the same as the ratio between the liability to that plan (X') and the liability to all plans (Y'), in both cases "determined without regard to [§ 1405]."

---

[43] 29 U.S.C. § 1405(e).

Expressed in mathematical terms, the formula is:

$$\frac{x}{y} = \frac{x'}{y'}$$

So imagine that you knew the present value of the total withdrawal liability (Y), the total withdrawal liability without applying § 1405 (Y'), and the amounts owed to the specific plan in question, again, without applying § 1405 (X').  How would you determine the withdrawal liability owed to the particular plan?  As a matter of algebra, you solve for X in the equation above by multiplying both sides of the equation by Y.  That is:

$$x = y * \left( \frac{x'}{y'} \right)$$

A treatise on ERISA explains the point the same way.  An employer's liability to a particular pension plan is calculated by multiplying the present value of the employer's withdrawal liability to all of the pension plans by a particular plan's share of the employer's total withdrawal liability as determined without applying the limits in 29 U.S.C. § 1405.[44]

On the off chance that the foregoing explanation is not crystal clear to the reader, a concrete example may help explicate the point.  Consider an employer that

---

[44] *See* Gary I. Boren and Norman P. Stein, 2 *Qual. Deferred Comp. Plans* § 18:52 (2024) ("The liability of the employer to each plan is determined by multiplying the present value of the employer's withdrawal liability to all plans after application of the limits, by a fraction: withdrawal liability of the employer to that plan determined without reference to the limits/withdrawal liability of employer to all plans determined without reference to the limits.").

had liability to two different multiemployer pension plans (Plan A and Plan B). Assume that the employer's share of Plan A's unfunded vested benefits is $10 million and its share of Plan B's unfunded vested benefits is $5 million.

Assume further that the annual payment owed to Plan A calculated under 29 U.S.C. § 1399(c)(1)(C) is $1 million and the annual payment owed to Plan B (calculated the same way) is $500,000. In that event, the debtor's total annual payment is $1.5 million. In the absence of the obligation to pay interest, the employer would pay its share of the unfunded vested benefits after making 10 annual payments. But as the Supreme Court opinion in *Joseph Schlitz* explained, the actual obligation does include interest. That operates to increase the number of annual payments necessary to satisfy the amount of withdrawal liability owed.

Following the equation set forth above, the first step in solving for X is figuring out how to calculate Y, which is the present value of the liability to all plans. Because the present value of the payments disregards the effect of the interest owed, the present value of the employer's *total* withdrawal liability is $15 million – the $10 million owed to Plan A plus the $5 million owed to Plan B.

What is the work done by § 1405(e)? Imagine that the prior sections of § 1405 (that impose other caps on an employer's withdrawal liability) reduced Plan A's total withdrawal liability by $2 million (to $8 million) but Plan B's total liability by $3 million (to $2 million). Part of the work done by § 1405(e) is to spread that $5 million in reductions ratably across the two plans. To determine the withdrawal liability of Plan A, you multiply the present value of the total withdrawal liability to

26

all of the plans *after the* application of the § 1405 reductions ($10 million) by Plan A's share of the total withdrawal liability *ignoring* the otherwise applicable § 1405 reductions. That share is 67% ($10 million/$15 million). The result is that Plan A's withdrawal liability claim is $6,666,667. Applying the same math to Plan B, its withdrawal liability claim is $3,333,333.

Presented in chart form (which may be easier to follow), the analysis is as follows:

| | Plan A | Plan B | Total |
|---|---|---|---|
| Annual payment | $ 1,000,000 | $ 500,000 | $ 1,500,000 |
| 10 annual payments (present value) | $ 10,000,000 | $ 5,000,000 | $ 15,000,000 |
| Percent of total based on present value (without section 1405 reductions) | 67% | 33% | 100% |
| Reduction under sections 1405(a) - (d) | $ (2,000,000) | $ (3,000,000) | $ (5,000,000) |
| Total withdrawal liability after reductions | $ 8,000,000 | $ 2,000,000 | $ 10,000,000 |
| Total withdrawal liabiity after 1405(e) (assuming the ratio by which one multiplies the present value of total liabilities includes interest) | $ 6,666,667 | $ 3,333,333 | $ 10,000,000 |

In substance, § 1405(e) takes the reductions required by § 1405 (a) – (d), and spreads them ratably across the plans. So even if one of those deductions would hit one plan harder than another, § 1405(e) spreads the reductions proportionally. In the hypothetical above, for example, Plan A (the larger plan) would otherwise suffer a $2 million reduction while Plan B (the smaller plan) would suffer a $3 million reduction. But § 1405(e) redistributes that $5 million in reductions on a *pro rata* basis across the plans. The result is that Plan A's claim is reduced by $3.33 million (*i.e.*, $10 million minus $6.67 million) while Plan B's is reduced by $1.67 million (*i.e.*, $5 million minus $3.33 million).

Importantly, on the analysis above, § 1405(e) also does a second thing. Because the total denominator that is being divided is the *present value of the liability* owed to all of the plans, § 1405(e) also operates to ensure that the employer's total withdrawal liability is a present value figure that does not include any of the interest that would otherwise be owed under ERISA.

During the argument on the motions, certain of the parties (as well as the Court, based on its own review of the statutory language) suggested that the provision might do a third thing. The suggestion was that the statute might operate to spread the effect of differing interest rate assumptions used by the actuaries across the various plans in a way that is similar to the way in which the § 1405(a) – (d) reductions are spread.

Perhaps that is correct. The analysis above was premised on the assumption that the language at the end of the statute – the part referred to above as $\left(\frac{x'}{y'}\right)$ – is referring to those liabilities in *present value* terms. But the language of the statute does not say that expressly. It only refers to the ratio between the withdrawal liability an employer owes to a particular plan and the employer's total amount of withdrawal liability, without indicating whether the amounts were in present value terms or based on the total amount of the payments (nominal terms).[45]

---

[45] The specific language of the statute is as follows: "[T]he withdrawal liability of the employer to such plan (determined without regard to this section) bears to the withdrawal liability of the employer to all such plans (determined without regard to this section)." 29 U.S.C. § 1405(e)(2).

If the assumption reflected in the analysis above is correct and the relevant ratio is to be calculated in present value terms, then a plan that used a higher interest rate assumption does no better than one that used a lower interest rate assumption. Because the plans' relative shares are calculated without respect to interest, the actuarial assumption does not affect any plan's relative share. On the other hand, if the interest that would be paid *is* included in the last portion of the statute, then plans with higher interest rate assumptions would recover a larger share of the total withdrawal liability payment. But importantly, the employer's aggregate withdrawal liability would not be affected.

This point can be seen in the chart below. It is premised on the chart above but builds in different interest rate assumptions between Plan A and Plan B and calculates each plan's share of the total withdrawal liability on the assumption that the ratio *includes* interest.

|  | Plan A | Plan B | Total |
|---|---|---|---|
| Annual payment | $  1,000,000 | $  500,000 | $  1,500,000 |
| 10 annual payments (present value) | $  10,000,000 | $  5,000,000 | $  15,000,000 |
| Percent of total based on present value (without section 1405 reductions) | 67% | 33% | 100% |
| Reduction under sections 1405(a) - (d) | $  (2,000,000) | $  (3,000,000) | $  (5,000,000) |
| Total withdrawal liability after reductions | $  8,000,000 | $  2,000,000 | $  10,000,000 |
| Actuarial assumption re: interest rate | 2.90% | 7.75% | |
| Number of annual payments including interest (without reductions under sections 1405(a) - (d) | 12.0 | 20.0 | |
| Withdrawal liability including interest | $12,000,000 | $10,000,000 | $  22,000,000 |
| Percent of total assuming interest is included | 55% | 45% | 100% |
| Total withdrawal liabiliy after 1405(e) | $  5,454,545.45 | $  4,545,454.55 | $ 10,000,000.00 |

As seen above, under this latter reading of the statute, a plan that used a higher interest rate assumption would end up holding a larger claim than it otherwise

would have; one that used a lower interest rate assumption would hold a smaller claim. Specifically, Plan A, which used a 2.9 percent interest rate (and thus would receive 12 annual payments instead of 10) would have its claim reduced from $6.67 million (under the prior assumption) to $5.45 million. Plan B, which used a 7.75 percent interest rate (and thus would receive 20 annual payments instead of 10) would have its claim increased from $3.33 million (under the prior assumptions) to $4.55 million. Although the employer's total withdrawal liability is still the present value of that total liability after taking the deductions required in § 1405(a) – (d) (here, $10 million), this alternative reading allocates that liability differently between the pension plans.

Ultimately, the Court concludes that it need not resolve these questions under § 1405(e). As described in Part IV, the Court concludes that § 502(b)(2) also operates to remove any and all interest from the calculation of the allowed claim in bankruptcy. It therefore is not necessary to rely on § 1405(e) to reach that same result. And because § 1405(e) was raised only in the debtor's opposition and not by any party that was seeking to reallocate withdrawal liability as among pension plans, the Court will not rely on § 1405(e) to require such a reallocation – either to adjust for the effect of the reductions required by § 1405(a) – (d) or for the effect of the different interest rates that the plans may have used in calculating their claims (which interest is going to be disallowed in any event).[46]

---

[46] For this reason, the Court also need not choose between the two readings of § 1405(e) set forth in the two charts above.

**IV.** **Even if 29 U.S.C. § 1405(e) did not do so, under § 502(b)(2) of the Bankruptcy Code, any claim for the unmatured interest in the calculation of withdrawal liability must be disallowed.**

As set forth above, the Court is not relying on § 1405(e) to present value the debtors' withdrawal liability. That gives rise to the question whether the withdrawal liability, which would otherwise extend over a period of up to 20 years, should be present valued as a matter of bankruptcy law.

The debtors argue in their objections that the 20-year stream of obligations should be discounted to present value.[47] The debtors' expert, whose report was provided in discovery and has been filed as an exhibit to the debtors' summary judgment motion, argues that the rate at which the pension plans' claims should be discounted should be based on Yellow's cost of debt capital, which he estimates as being between 13 percent and 18 percent.[48] In effect, the debtors' ask that the Court determine now that the withdrawal liability claims should be discounted at the debtors' cost of capital, with the precise rate to be decided at trial.[49] The pension plans take a variety of different approaches to the issue, with many contending that claim should not be discounted at all.[50]

For the reasons described below, the Court concludes that § 502(b)(2) of the Bankruptcy Code, which provides that claims for unmatured interest are to be

---

[47] D.I. 2595 at 12-13.

[48] D.I. 5181-4 at 8 (Ex. 14, Seru Report).

[49] *See* D.I. 5381 at 27 (debtors' opposition to plans' summary judgment motions, arguing that correct discount rate is based on debtors' cost of debt).

[50] *See* D.I. 5461 at 3-6.

disallowed, operates in substance to present value a claim when the debtor's obligation to a creditor is a stream of future payments that includes either an express or an implied rate of interest. In *Oakwood Homes*, the Third Circuit held that if unmatured interest has been taken out of a stream of future payments, it would constitute improper "double discounting" to further present discount that stream of payments. As this Court sees the issue, under the principle of *Oakwood Homes*, if the future payments contain a built-in interest rate, disallowing the claim for future interest *is* the way the Bankruptcy Code present values a future claim.

While the paradigmatic example of unmatured future interest likely arises when the debtor receives a loan and the parties have expressly negotiated the rate of interest, that is not the only example. At times, an interest rate (and thus the unmatured interest) may be implicit in the terms reached between the parties. When that is the case, a bankruptcy court should, following the established principle of federal bankruptcy law to focus on the economic substance of the parties' relationship rather than its form, separate the remaining amounts due into principal and unmatured interest and disallow that portion of the remaining liability that is properly characterized as unmatured interest. In this case, that is a straightforward task. While the interest that is implicit in the withdrawal liability claim (as described in Part III.A) is fundamentally a function of ERISA, and not the result of bargaining between the parties, it is nevertheless interest. That amount should be disallowed under § 502(b). And under the rationale of *Oakwood Homes*, no further present discounting is appropriate.

**A.** **Under *Oakwood Homes*, disallowance of unmatured interest *is* the Bankruptcy Code's method of present valuing future claims; when future payments include unmatured interest, no further present discounting is appropriate.**

No one contests that, because of the time value of money, a stream of payments stretching out over twenty years is worth less than having the total sum of those amounts paid today. As the Supreme Court put the point in *Till*, a "promise of future payments is worth less than an immediate payment in the same total amount because [the promisee] cannot use the money right away, inflation may cause the value of the dollar to decline before the [promisor] pays, and there is always some risk of nonpayment."[51] Or as the Third Circuit said in *Oakwood Homes*, "money received today is more valuable than money negotiated to be received in the future."[52]

One of the ways that bankruptcy law accounts for the time value of money is that, under § 502(b)(2) of the Bankruptcy Code, claims for unmatured interest are disallowed.[53] The disallowance of claims for unmatured interest operates, in part, to give effect to the point, described above in Part II and in the Third Circuit's decision in *Promise*, that the petition date operates as a line drawn in the sand – the date as of which the debtor's assets and liabilities are measured.[54] Another part of what

---

[51] *Till v. SCS Credit Corp.*, <u>541 U.S. 465, 474</u> (2004). *See also In re Ultra Petroleum Corp.*, <u>51 F.4th 138, 148</u> (5th Cir. 2022) ("A dollar today is worth more than a dollar tomorrow.").

[52] *In re Oakwood Homes*, <u>449 F.3d at 598</u>.

[53] <u>11 U.S.C. § 502(b)(2)</u> ("the court … shall determine the amount of such claim … as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that … such claim is for unmatured interest").

[54] *See In re Promise Healthcare Group*, <u>2025 WL 666366</u>, at *4.

§ 502(b) does, however, is to present discount a schedule of liabilities that may arise in the future.

Consider, for example, a claim by a lender who advanced $10 million to the debtor on a 20-year loan, with annual payments at an interest rate of 8 percent. Using standard amortization principles, the payment schedule on such a loan would be as follows:

| Year | Payment | Principal | Interest |
|------|---------|-----------|----------|
| 1 | $1,018,522.09 | $218,522.09 | $800,000.00 |
| 2 | $1,018,522.09 | $236,003.86 | $782,518.23 |
| 3 | $1,018,522.09 | $254,884.16 | $763,637.92 |
| 4 | $1,018,522.09 | $275,274.90 | $743,247.19 |
| 5 | $1,018,522.09 | $297,296.89 | $721,225.20 |
| 6 | $1,018,522.09 | $321,080.64 | $697,441.45 |
| 7 | $1,018,522.09 | $346,767.09 | $671,755.00 |
| 8 | $1,018,522.09 | $374,508.46 | $644,013.63 |
| 9 | $1,018,522.09 | $404,469.13 | $614,052.95 |
| 10 | $1,018,522.09 | $436,826.67 | $581,695.42 |
| 11 | $1,018,522.09 | $471,772.80 | $546,749.29 |
| 12 | $1,018,522.09 | $509,514.62 | $509,007.47 |
| 13 | $1,018,522.09 | $550,275.79 | $468,246.30 |
| 14 | $1,018,522.09 | $594,297.86 | $424,224.23 |
| 15 | $1,018,522.09 | $641,841.68 | $376,680.40 |
| 16 | $1,018,522.09 | $693,189.02 | $325,333.07 |
| 17 | $1,018,522.09 | $748,644.14 | $269,877.95 |
| 18 | $1,018,522.09 | $808,535.67 | $209,986.42 |
| 19 | $1,018,522.09 | $873,218.53 | $145,303.56 |
| 20 | $1,018,522.09 | $943,076.01 | $75,446.08 |
| **TOTAL** | $20,370,441.76 | $10,000,000.00 | $10,370,441.76 |

If the borrower were to perform fully on the loan, over its 20-year life, the borrower would pay the lender a total of approximately $20.37 million, of which $10 million would be the return of the principal and $10.37 million would be interest payments. But if the borrower were to file for bankruptcy immediately after the loan

34

were funded, the lender would not have a claim in bankruptcy for $20.37 million (which is, in effect, what most of the pension plans are suggesting should be their allowed claims). Rather, under § 502(b)(2), the claim for unmatured interest would be disallowed, and the lender would have an allowed claim for $10 million.

Viewed this way, it seems plain enough that the work done by § 502(b)(2) *is* to present value a schedule of future payments. In substance, what disallowing the claim for unmatured interest does is to present discount the stream of future payments, with the discount rate being the rate of interest under the loan. To use the example above, the present value of 20 annual payments of $1,018,522.09, discounted at a rate of 8 percent, is $10 million.[55]

This is the commonsense insight that undergirds the Third Circuit's decision in *Oakwood Homes*. In that case, the bankruptcy court first disallowed a creditor's claim for unmatured interest, and *then* further discounted the stream of future payments to present value. The Third Circuit found this to be improper. Relying on the legislative history of § 502(b), the court observed that "it is irrelevant whether a court applies § 502(b)(2) to disallow unmatured interest, or discounts the *entire amount* (*i.e.*, principal plus interest) to present value—as long as the court performs only *one* such operation and not both, the result is the same."[56] The Third Circuit

---

[55] *Cf. Oakwood Homes*, 449 F.3d at 600 ("Although potentially complex, present value can be simplified if a deferred promise to pay bears a market rate of interest; after the math is done, such a note will have a present value equal to its face amount.") (quoting 7 *Collier on Bankruptcy* ¶ 1129.03).

[56] *Id.* (emphasis in original) (citing H.R. Rep. No. 95–595, at 352–54 (1977); S. Rep. No. 95–989, at 62–65 (1978)).

illustrated this point with an example, similar to the one provided in the chart above. A borrower that receives a $1,000 loan payable over 10 years at 5 percent interest will pay the lender $1,629.89 over the life of the loan. And while the present discounted value of the payments to be made on that loan would be $1,000, if one were to present value only the repayment of principal (after disallowing the claims for unmatured interest) at the same 5 percent rate, the total allowed claim on the $1,000 loan would be only $613.91. As the Third Circuit made clear, such "double discounting" is obviously incorrect.

That point explains why the Court rejects the claim that counsel for MFN Partners, one of the debtors' equity holders, made at oral argument on the current motion. In testing the proposition whether present discounting is appropriate beyond the disallowance of unmatured interest, the Court asked counsel whether a lender that made an interest-free loan (such that there is no unmatured interest to be disallowed under § 502(b)(2)) should receive an allowed claim for the full amount of outstanding principal or should instead have its claim discounted to present value, yielding an allowed claim that is less than the outstanding principal.

Counsel argued that if a debtor were the borrower on an interest-free loan, the claim should be present discounted to an amount less than the unpaid principal.[57] The obvious difficulty with that argument, however, is that it has no logical stopping

---

[57] Jan. 28, 2025 Hr'g Tr. at 53 (contending that present discounting is appropriate because "in any case of a zero interest loan, given economic realities in this world, you are losing money …. if you loaned me that million dollars, you're basically saying here's a million dollars, pay me back less than that.").

point.  If that is the correct result with an interest-free loan, then the same rationale should presumably apply any time a creditor filed a claim on account of a prepetition loan whose interest rate was lower than the rate that a court would otherwise find to be the proper discount rate.  Counsel deserves credit for sticking to his guns and following the logic of his position through to its logical conclusion, effectively acknowledging that determining the allowed claim on any loan would require a comparison between the stated interest rate and prevailing market rates.[58]

The basic error in this position is that it would create a system in which creditors are treated equally *on account of their economic position outside of bankruptcy*.  But that is not what bankruptcy law does.  Rather, it treats creditors equally *on account of their allowed claims*.  A lender who makes a $1 million loan to a debtor bearing 8 percent interest, and maturing in five years, has greater rights, outside of bankruptcy, than one who makes an otherwise equal loan on the same day at 4 percent interest.  The first is owed $1.25 million over five years, while the second is owed only $1.12 million.  But if the debtor files for bankruptcy the day after closing on those two loans, both creditors have their claims for unmatured interest disallowed, leaving each as the holder of an allowed claim for $1 million.  So while the Court appreciates the position articulated by MFN's counsel that present discounting the plans' withdrawal liability claims using an appropriate discount rate would "put the claims on an equal playing field with other creditors," that vision of

---

[58] *Id.* (acknowledging that the question whether a claim on account of below-market loan should be present discounted beyond the disallowance of unmatured interest "is a question of law for the Court that's been … presented here").

"equal treatment" reflects a different vision of equality than the one codified in the Bankruptcy Code. The way the Code deals with the problem of present valuing interest-bearing claims that will mature in the future is by disallowing that portion that is attributable to unmatured interest.

> **B.    Nothing in § 502(b)(2) is limited to contractual interest as agreed between the parties; the interest that is included by virtue of actuarial assumptions under ERISA should be disallowed under § 502(b).**

The debtors' principal response to this argument is that the rationale of *Oakwood Homes* applies only to interest rates that are set forth in a "bargained for debt instrument."[59] Their position appears to be that when the interest rate is either statutorily imposed or simply implicit the in the parties' economic arrangement, § 502(b)(2) is not applicable, leaving the court free to make its own judgment about the proper interest rate to use to present discount the stream of payments. The Court is unpersuaded, however, that this distinction is a relevant one with respect to the application of § 502(b)(2).

It is well established that bankruptcy courts have the authority, when viewing an economic arrangement, to look through the labels that may be affixed to it in order to treat that relationship appropriately in light of its economic reality. That principle traces its roots to the Supreme Court decision in *Pepper v. Litton*, where the Court made clear that bankruptcy law preserved the traditional equitable power to ensure that "substance will not give way to form."[60] There, the Court had no trouble with

---

[59] D.I. 5181 at 37.

[60] *Pepper v. Litton*, <u>308 U.S. 295, 305</u> (1939).

38

the proposition that amounts due to the debtor's principal, ostensibly for unpaid wages due to him, were properly treated as capital contributions, and thus as equity interests rather than in "pari passu treatment with the claims of other creditors."[61] Bankruptcy courts regularly invoke this authority to, among other things, recharacterize arrangements that the parties may describe as loans as equity contributions or agreements characterized as leases as secured loans.[62]

This same principle can be invoked to determine whether unmatured interest (that should be disallowed under § 502(b)(2)) is implicitly included in an economic arrangement even when the parties have not made any express reference to an interest rate. The paradigmatic example of this involves original issue discount in connection with a bond. If an issuer sold a bond for $1,000 that would have a value upon maturity, one year later, of $1,050, without paying any incremental interest (in the form of a "coupon") along the way, it is settled law that for purposes of § 502(b)(2) of the Bankruptcy Code, this instrument would be treated as a $1,000 loan bearing 5 percent interest.[63] The *pro rata* portion of that interest that had not "accrued" as of the petition date would thus be disallowed.

---

[61] *Id.* at 306.

[62] *See In re SubMicron Sys. Corp.*, <u>432 F.3d 448, 454-455</u> (3d Cir. 2006) (articulating standard for recharacterizing what purports to be a debt claim as equity); *In re Pillowtex*, <u>349 F.3d 711, 717-718</u> (3d Cir. 2003) (addressing recharacterization of a purported lease as a secured loan).

[63] *See Oakwood Homes*, <u>449 F.3d at 597</u> n.7 ("Original issue discount reflects the fact that a claimant might have paid less than the face value on a note, and could therefore only recover in bankruptcy up to the amount actually paid. The interest portion of such a note would need to be similarly pro-rated for purposes of disallowing post-petition interest.").

Or consider a furniture store that offers a buyer of a living room set the choice between paying $5,000 in cash or an installment plan under which the buyer is obligated to make monthly payments of $101 for 5 years (an amount that would yield total payments of $6,060). What happens if the buyer were to choose the installment plan and then file for bankruptcy the day after the purchase? The answer is that, under the principle of *Pepper v. Litton*, the substance of the transaction must prevail over its form. And the substance of this installment plan is that it is the economic equivalent of a loan bearing interest at 8 percent. So in the buyer's bankruptcy case filed immediately after the sale, the store would hold an allowed claim for $5,000. If the store were to file a claim for the full $6,060 it would have been paid outside of bankruptcy, $1,060 of that claim would be disallowed as unmatured interest under § 502(b)(2).

This commonsense point – that at times a party's obligation to make one or more payments over a period of time contains an *implicit* interest component, even if the articulation of the payment(s) as one part principal and another interest is not express – should provide the starting point to answering the question that the Third Circuit left open in *Oakwood Homes*. The Third Circuit there explained that the language of § 502(b), which provides that a court shall "determine the amount of such claim … as of the date of the filing of the petition" does not *necessarily* by itself provide for the present discounting of amounts that would come due in the future. "We do not hold here that 11 U.S.C. § 502(b) *never* authorizes discounting a claim to present value, but instead that the statute does not clearly and unambiguously *require* it for

40

all claims evaluated under § 502."[64]  The court added, however, that in "general, we of course acknowledge that money received today is more valuable than money negotiated to be received in the future, and reduction in recognition of that basic economic fact may sometimes be appropriate."[65]

The court did not need to reach *when* such a reduction would be appropriate, as that question was obviated by its conclusion that where there *is* an express interest component to a stream of future payments, unmatured interest should be disallowed under § 502(b)(2), and any further discounting to present value is improper "double discounting."[66]

Other courts, however, have engaged the question that *Oakwood Homes* left open.  In *In re B456 Systems*, for example, Judge Carey concluded that, under *Oakwood Homes*, a rejection damages claim *was* subject to being discounted to present value, at a discount rate to be set by the court, because the claim at issue there "is not based upon an interest-bearing instrument and did not include any bargained-for right to interest."[67]  This Court, however, does not read either *Oakwood Homes* or *B456 Systems* to suggest that § 502(b)(2) applies only when the rate of interest is expressly set forth in a bargained-for contract.  Such a reading would be inconsistent with the *Oakwood Homes* court's recognition that an original issue

---

[64] *Id.* at 598 (emphasis in original).

[65] *Id.*

[66] *Oakwood Homes*, <u>449 F.3d at 601</u>.

[67] *In re B456 Sys., Inc.*, No. 12-12859-KJC, <u>2017 WL 6603817</u>, *22 (Bankr. D. Del. Dec. 22, 2017).

41

discount bond has an implied interest component and the long line of cases, dating to *Pepper v. Litton*, that direct bankruptcy courts to focus on substance rather than form.[68] This Court accordingly concludes that when a stream of payments *does* include an implicit interest component, the proper method of present discounting is to disallow that portion of the claim that seeks to recover that implicit unmatured interest. Under the rationale of *Oakwood Homes*, no further discounting is appropriate.

Accordingly, the relevant question here is whether the up to 20-year schedule of payments that is calculated pursuant to ERISA includes an interest component that should be disallowed from the claim in bankruptcy under § 502(b)(2) of the Bankruptcy Code. The answer to that question, as described in Part III.A above, is clearly yes with respect to those pension plans whose withdrawal liability claims are not affected by the 20-year cap imposed by 29 U.S.C. § 1399(c)(1)(B). For those plans, the interest that was added at the rate used in calculating minimum funding is unmatured interest and should be disallowed from the claim in bankruptcy.

It bears note that one of the pension plans, Local 705, asserts that it calculated its claim in precisely this fashion. As Local 705 states in its briefing, the total stream of payments that would be owed to it on its withdrawal liability claim would come to $25,596,814.[69] But that amount includes interest running at 6.75 percent per year. With that interest removed, Local 705's claim is reduced to $17,830,282, which is the

---

[68] *See Oakwood Homes*, 449 F.3d at 597 n.7.

[69] D.I. 5163 at 13.

amount of the claim it presently asserts.[70]  The Court concludes that this is the correct

mode of analysis.

>    **C.    Even for those plans whose claims are subject to the 20-year cap,
>    withdrawal liability is calculated by dividing the total claim into
>    principal and interest using normal principles of amortization
>    (at the applicable interest rate) and disallowing the claim for
>    unmatured interest under § 502(b)(2).**

The only possible complication involves those plans for which the debtors'

share of the unfunded vested benefits exceeds the cap imposed by § 1399(c)(1)(B).  The

complication stems from the fact that (as described in Part III.A) the Supreme Court's

decision in *Joseph Schlitz* suggested that under ERISA, the interest should be tacked

on to the *end* of the withdrawal liability payments, after the "principal" amount of

the employer's share of the fund's unfunded vested benefits is paid.  For that reason,

the Supreme Court suggested, if the "principal" amount exceeds the value of 20

annual payments, then the "capped" withdrawal liability obligation is effectively all

principal and no interest.  Consider, for example, a plan for which the debtor's share

of its unfunded vested benefits would be, say, 40 times the annual payment.  Taking

the language of *Joseph Schlitz* very literally, such a plan might contend that its claim

for the first 20 years' worth of annual payments is *entirely* a claim for principal, since

any interest would be tacked onto the end of the 40-year stream of payments.

This Court, however, does not believe that the question of claims allowance

under § 502(b) of the Bankruptcy Code should be viewed through this lens.  Rather,

the claim for 20 years' worth of payments should be divided into principal and interest

---

[70] *Id.* at 14.

using normal principles of amortization (at the applicable interest rate) and the claim for unmatured interest disallowed under § 502(b)(2).

This manner of harmonizing the commands of federal bankruptcy law with the requirements of ERISA makes sense for two reasons that are rooted in ERISA itself. The first is that this notion that the interest payment is tacked on at the end is neither specified in ERISA itself nor were the statements in *Joseph Schlitz* necessary to the Court's decision. The relevant statutory language is set forth in 29 U.S.C. § 1399(c)(1)(A)(ii) and provides only that "[t]he determination of the amortization period described in clause (i) shall be based on the assumptions used for the most recent actuarial valuation for the plan."[71] And clause (i) directs that the payment shall be made "over the period of years necessary to amortize the amount in level annual payments."[72] Nothing in the statute says expressly whether, in cases in which § 1399(c)(1)(B)'s 20-year cap applies, the interest payments come at the end of the relevant period.

Recall that the issue before the Supreme Court in *Joseph Schlitz* was whether interest on the withdrawal liability obligation began running at the beginning of the year *after* the withdrawal or the beginning of the year *before* the withdrawal. The

---

[71] 29 U.S.C. § 1399(c)(1)(A)(ii).

[72] *Id.* § 1399(c)(1)(A)(i). As described above, *see supra* n. 39, those annual payments are calculated by "multiplying (x) the highest contribution rate in the prior ten years times (y) the highest average number of contribution base units over three consecutive plan years within the 10-year withdrawal liability period." D.I. 5619 at 21.

44

Court concluded that interest begins to accrue at the beginning of the year *after* the withdrawal, and not during the year of the withdrawal itself.[73]

The point the Court was making in the passage where it states that the interest "shows up at the end of the payment schedule" was that the manner in which ERISA calculates withdrawal liability does not lead to a calculation of "an actuarially perfect fair share" of the unfunded vested benefits.[74] To illustrate that point, the Court explained that when the 20-year cap applies, some portion of the employer's share of the unfunded vested benefits will go unpaid. Specifically, the opinion states that:

> For another thing, [ERISA] forgives all annual installment payments after 20 years, see § 1399(c)(1)(B) – and that means that, if an employer's normal annual contribution was low compared to the withdrawal charge, the presence or absence of withdrawal-year interest (which shows up at the end of the payment schedule…) will make no difference (for the last payments will never be made).[75]

In other words, if the application of the annual cap (without interest) would consume 18 annual payments, and adding interest would require four additional payments, then the employer's withdrawal liability will be actuarially imperfect, because the employer will only be required make 20 payments – not 22. But because dollars are fungible and because addition is subject to the transitive property, the basic point the Court is making is true whether the interest payments are made first, last, or are subject to ordinary principles of amortization. The Supreme Court has often admonished that language in judicial opinions should not be "parsed as though

---

[73] *Joseph Schlitz*, 513 U.S. at 421-422 (quoting 29 U.S.C. § 1399(c)(1)(A)(i)).

[74] *Id.* at 426.

[75] *Id.*

we were dealing with language of a statute."[76]  In light of that principle, this Court does not believe it appropriate to treat the Court's casual reference to interest being tacked onto the end of the withdrawal liability payment as controlling in this very different context.

The second reason in support of that conclusion comes from 29 U.S.C. § 1405(e), which is discussed in Part III.B, above.  As described in detail there, one unmistakable result of the application of § 1405(e) is that when there are "one or more withdrawals of an employer attributable to the same sale, liquidation, or dissolution," as is the case here, the employer's aggregate withdrawal liability, to all of the plans from which it withdrew, is capped at the *present value* of that aggregate liability.  So even if the Court's opinion in *Joseph Schlitz* required the conclusion that 29 U.S.C. § 1399 would generally require interest to be tacked on to the end of the withdrawal liability payments, it would still need to give way to the more specific dictate of § 1405(e), which limits the employer's aggregate withdrawal liability to its present value, and thus necessarily involves removing the interest component from all of the withdrawal liability claims, including those that are subject to the 20-year cap.

In the context of claims allowance under § 502(b) of the Bankruptcy Code, the most sensible way to respect that clear statutory requirement set forth in § 1405(e), while also respecting the 20-year cap provided in § 1399(c)(1)(B), is to calculate the plan's claim against the employer in bankruptcy by dividing the total claim into

---

[76] *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979).

46

principal and interest using normal principles of amortization (at the applicable interest rate) and disallowing the claim for unmatured interest under § 502(b)(2). Such a calculation harmonizes the Bankruptcy Code's command that claims for unmatured interest be disallowed with the objective of § 1405(e) to ensure that the total withdrawal liability owed by a withdrawing employer undergoing liquidation be limited to its present value. For these reasons, the Court concludes that the various plans' withdrawal liability claims in this bankruptcy case should be calculated in the manner described herein.

## V.   The § 1405(b) adjustment is applied after § 1381's 20-year cap.

Section 1405(b) of title 29 caps the unfunded vested benefits allocable to an employer "in the case of an insolvent employer undergoing liquidation or dissolution."[77] The amount of the cap is as follows:

> an amount equal to the sum of—
>
> (1) 50 percent of the unfunded vested benefits allocable to the employer (determined without regard to this section), and
>
> (2) that portion of 50 percent of the unfunded vested benefits allocable to the employer (as determined under

---

[77] 29 U.S.C. § 1405(b).

paragraph (1)) which does not exceed the liquidation or dissolution value of the employer determined—

> (A) as of the commencement of liquidation or dissolution, and
>
> (B) after reducing the liquidation or dissolution value of the employer by the amount determined under paragraph (1).[78]

In effect, § 1405(b) limits the maximum liability of a withdrawing employer that is insolvent and liquidating or otherwise dissolving. The employer's allocable share of unfunded vested benefits will never be less than half of what it would have otherwise been (that is the effect of § 1405(b)(1)). But to the extent the unfunded vested benefits would be greater than the liquidation value of the employer (as of the commencement of its liquidation), then the employer's share of the unfunded vested benefits is capped at its liquidation value. That is the work done by § 1405(b)(2).[79]

The parties dispute when the § 1405(b) cap should be applied. That is, the parties disagree whether, when § 1405(b)(1) talks about "the unfunded vested

---

[78] *Id.*

[79] One case cites various commentators that read the provision to mean that "the multiemployer plan will have the status of a creditor with respect to the first 50% of its withdrawal liability claim; after all other creditor claims have been satisfied in full, the remaining 50% of withdrawal liability claim will be satisfied ahead of equity security holders." *See In re Cott*, 26 B.R. 332, 335 (D. Conn. 1982) (citing Soble, *Bankruptcy Claims of Multiemployer Pension Plans,* 33 Lab.L.J. 57 (1982); Perkins, *Pension Claims in Bankruptcy,* 32 Lab.L.J. 343 (1981)). *See also In re Affiliated Foods, Inc.*, 249 B.R. 770, 785-786 (Bankr. W.D. Mo. 2000) (finding that it is "generally accepted" that 29 U.S.C. § 1405(b) has this meaning). For this reason, the parties describe § 1405(b) as a "subordination" provision. But at least as this Court reads the words of 29 U.S.C. § 1405(b), it appears to operate more as a cap on the plan's claim in bankruptcy – and thus limits the dilution of other creditors – than as a "subordination" provision akin to those set forth in § 510 of the Bankruptcy Code. Nothing in the dispute now before the Court, however, turns on whether § 1405(b) is properly described as a "subordination" provision.

benefits allocable to the employer (determined without regard to this section)," it is referring to the unfunded benefits before or after the imposition of the 20-year cap contemplated by 29 U.S.C. § 1381(b). The Court concludes (a) that the debtors' argument on this issue has been sufficiently preserved; (b) that under the federal rules, this question may be resolved on partial summary judgment even though the debtors' solvency is itself an open question; (c) that § 1405(b) does apply in a chapter 11 liquidation; and (on the merits) (d) that, in light of the order operations set forth in 29 U.S.C. § 1381(b)(1), the calculation required by § 1405(b) is performed *after* reducing the unfunded benefits pursuant to the 20-year cap.

### A. The debtors' § 1405(b) argument is properly preserved.

Certain pension plans argue that the debtors have waived their § 1405(b) argument because the claim was only made in footnotes.[80] That, they argue, was insufficient to preserve the argument and therefore this Court should deny the debtors' motion on this issue.

"[T]he waiver rule is one of discretion rather than jurisdiction."[81] When confronted with an argument that was preserved imperfectly (or even inadequately), courts may nevertheless address it on the merits if they conclude that the "public interest is better served by addressing [it] than by ignoring it" and as long as the

---

[80] D.I. 5378 at 10-11; D.I. 5377 at 16.

[81] *In re Imerys Talc Am.*, 38 F.4th 361, 373 (3d Cir. 2022) (internal quotations and citations omitted).

court is satisfied that doing so "does not cause surprise or prejudice" to other parties in interest.[82]

It is true that the debtors initially raised the § 1405(b) argument in a footnote on the last page of their relevant objections, and again in a footnote in their disclosure statement.[83]   A court could certainly decline to consider an argument that was presented in such a backhanded fashion.   At the same time, the initial claims objections did at least identify the issue for the relevant parties in interest.

Most importantly, the Court is satisfied that addressing this issue on the merits will not unfairly prejudice the objecting plans.   All parties have now had a reasonable opportunity to present their arguments on the issue.   So in the absence of any identifiable prejudice, this Court is inclined to exercise its discretion in favor of getting to the result actually required under the law, rather than applying the strictest possible construction of the rules of waiver.

### B.   This Court may grant partial summary judgment on a part of the debtors' § 1405(b) claim under Rule 56.

Various plans also argue that because there has been no determination that the debtors were insolvent on the petition date, and § 1405(b) applies only if they were, it is premature to consider a motion for summary judgment regarding how § 1405(b) might operate if it turns out to be applicable.   Doing so, they contend, would

---

[82] *Id.* (internal quotations and citations omitted).

[83] D.I. 1962 at 32 n.65; D.I. 2595 at 13 n. 24; D.I. 5027 at 9 n.6.

be advisory because we do not yet know whether addressing the issue is necessary to resolve the specific dispute before the Court.[84]

The 2010 Amendments to Rule 56 of the Federal Rules of Civil Procedure expressly permit a party to seek summary judgment on a "part of each claim or defense" while holding the remaining issues for trial.[85] That means that if a plaintiff is asserting a claim against a defendant on a cause of action for which there are three elements, the plaintiff can seek partial summary judgment on the first two elements, even if the plaintiff acknowledges that genuine issues of material fact require a trial on the third.

That scenario is no different than having this Court address the dispute about *how* § 1405(b) would operate despite the fact that the question *whether* § 1405(b) applies in this case remains unresolved. This Court is satisfied that its consideration of the debtors' motion for partial summary judgment on this basis is no more "advisory" than the paradigmatic motion for partial summary judgment on two elements of a claim but not the third. Notwithstanding the fact that the resolution of those specific elements does not necessarily entitle a party to any concrete relief, they may be addressed on a motion for partial summary judgment. As Judge

---

[84] *See* D.I. 5378 at 8-10. Jan. 28, 2025 Hr'g Tr. at 96. *See also* D.I. 5165 at 13-14; D.I. 5377 at 14.

[85] Fed. R. Civ. P. 56(a), advisory committee's note to 2010 amendment. Rule 56 of the Federal Rules of Civil Procedure (as amended) is made applicable here through Federal Rules of Bankruptcy Procedure 9014(c) and 7056.

Shannon put it: "[T]he argument that summary judgment is not proper for a portion of a single claim has lost its pluck" since the 2010 amendment.[86]

The Court is therefore satisfied that the debtors' motion is procedurally proper. As amended in 2010, Rule 56 allows parties to seek "issue-narrowing adjudication" on certain elements of a claim.[87] That is the type of relief that the debtors are seeking here. As such, there is no procedural impediment to considering the motion on the merits.[88]

C. **29 U.S.C. § 1405(b) applies in the context of a chapter 11 liquidation.**

Only one party – the Philadelphia Plan – contests the threshold applicability of § 1405(b) in a liquidation conducted through the chapter 11 process.[89] That argument is contrary to applicable law.

To be sure, the plan correctly points out that § 1405(b), which is about liquidation and dissolution, does not apply to withdrawing employers that reorganize

---

[86] *In re SemCrude*, No. 09-50978 (BLS), 2012 WL 694505, at *3 (Bankr. D. Del. Mar. 1, 2012). *See also Hudak v. Clark*, No. 3:16-cv-288, 2018 WL 1785865, at *2 (M.D. Pa Apr. 13, 2018).

[87] *See, e.g.*, *In re SemCrude*, 2012 WL 694505, at *3; *Servicios Especiales Al Comercio Exterior v. Johnson Controls*, 791 F. Supp. 2d 626, 630 (E.D. Wis. 2011); *Hudak v. Clark*, 2018 WL 1785865, at *2 (finding that, as a procedural matter, the plaintiff's motion for summary judgment on a single element, and none of the other necessary elements of its claim, was procedurally proper).

[88] Certain plans also argue that the Court should not address the question because its resolution may not make a difference to the calculation of their claims.  *See* D.I. 5169 at 28; D.I. 5165 at 15. There will certainly be cases in which the question whether § 1405(b)(1) is applied before or after the 20-year cap will make no difference. But that poses no more of an obstacle to considering the motion for partial summary judgment on the issue than does the possibility discussed above that the debtors may turn out to be solvent (which would similarly obviate the issue).

[89] D.I. 5370 at 19-20.

under chapter 11 of the Bankruptcy Code.[90]  And while the title of chapter 11 is "reorganization," it is by now well settled that a company may use chapter 11 to liquidate.[91]  Courts agree that a company liquidating through chapter 11 is still undergoing a 'liquidation' for purposes of 29 U.S.C. § 1405(b).[92]  And there can be no dispute that the debtors in these cases, that have sold their terminals and rolling stock, are in fact undergoing a liquidation.  The legislative history of ERISA likewise indicates that the drafters were more concerned that employer was actually undergoing a liquidation than the manner in which that liquidation was conducted.[93]

The Court thus concludes that the debtors are undergoing a liquidation for the purposes of 29 U.S.C. § 1405(b).

### D. 29 U.S.C. § 1405(b) applies in addition to, not instead of, the 20-year cap.

As discussed at length in this Court's earlier decisions on this topic, an employer's withdrawal liability is equal to its allocable share of the plan's unfunded vested benefits as reduced by various mandatory adjustments.[94]  A plan's unfunded vested benefits are the value of the plan's "nonforfeitable benefits" (*i.e.*, what the plan

---

[90] D.I. 5370 at 20-21.

[91] *See In re Goody's LLC*, 508 B.R. 891, 906 (Bankr. D. Del. 2014) ("liquidation may be contemplated in a valid Chapter 11 plan of reorganization") (internal citations omitted).

[92] *In re Deer Park, Inc.*, 136 B.R. 815, 818 (B.A.P. 9th Cir. 1992); *In re Advance-United Expressways, Inc.*, 86 B.R. 602, 605 (Bankr. D. Minn. 1988).

[93] *In re Advance-United Expressways, Inc.*, 86 B.R. at 605 (quoting *Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980*, 126 CONG. REC. 20189, 20195 (1980)).

[94] 29 U.S.C. § 1391(a).  *See also* D.I. 4326, 4769.

will owe to participants in the future) minus the value of the plan's assets at that point in time.[95]

To determine the withdrawing employer's allocable share of the plan's unfunded vested benefits, the plan's actuary will divide the total amount of plan contributions by the withdrawing employer's contributions.[96] That amount is then analyzed under 29 U.S.C. § 1381(b)(1) to determine whether any reductions need to be applied.[97]

Section 1381(b)(1) lists four reductions, which proceed in a series of steps. "[F]irst," the plan should apply any applicable de minimis reductions.[98] "[N]ext," the plan must make certain reductions if there was a partial withdrawal.[99] "[T]hen," the plan must apply the 20-year cap (if applicable).[100] And "*finally*," the plan must apply any applicable reductions under 29 U.S.C. § 1405.[101]

The 20-year cap – the third of the four steps in the process – applies if, in view of the fixed annual payment amount, it would take the withdrawing employer more than 20 years to pay off its withdrawal liability. This Court previously explained that even if the debtors had defaulted on their obligation to pay withdrawal liability before

---

[95] *Id.* § 1393(c).

[96] 29 C.F.R. § 4211.15(c)(2).

[97] 29 U.S.C. § 1381(b).

[98] *Id.* § 1381(b)(1)(A).

[99] *Id.* § 1381(b)(1)(B).

[100] *Id.* § 1381(b)(1)(C).

[101] *Id.* § 1381(b)(1)(D) (emphasis added).

54

the petition date (they had not), any "accelerated" obligation to pay withdrawal liability would still be subject to the 20-year cap provided for in § 1381(b).[102]

The fourth step in the process prescribed by § 1381 is the application of any reductions required by § 1405(b), which as described above is applicable if the withdrawing employer is insolvent and undergoing a liquidation or dissolution.[103] The debtors argue that it should be applied after their allocable share of unfunded vested benefits is subjected to the 20-year cap. The plans advance two arguments in opposition. *First*, they argue that this Court has previously held that withdrawal liability is, unequivocally, the amount the employer owes after application of the 20-year cap and that the debtors' position is contrary to the law of the case.[104] And, *second*, the plans contend that § 1405(b), by its own terms, provides for the application of the reduction to the "unfunded vested benefits allocable to the employer" and not the unfunded vested benefits as adjusted by § 1381(b)(1).[105] The Court finds neither of these arguments persuasive for the reasons discussed (in reverse order) below.

---

[102] D.I. 4769.

[103] 29 U.S.C. § 1405(b).

[104] D.I. 5169 at 26.

[105] *Id.* at 26-28; 29 U.S.C. § 1405(b).

55

1.    **The text of § 1381(b)(1) establishes the order in which the various withdrawal liability adjustments must be applied.**

Section 1381(b)(1) of title 29 sets forth the order by which the various adjustments should be applied.[106]  And the statute makes plain that the § 1405(b) reductions are to be applied last; after the 20-year cap.[107]  Section 1381(b)(1)(C) (the 20-year cap) is joined to § 1381(b)(1)(D) (the § 1405 reductions) by the words "and finally."[108]  The text of § 1381(b)(1) unambiguously sets forth the order of operations that should be used when applying the various discounts to a withdrawing employer's withdrawal liability.

The Ninth Circuit reached the same conclusion in *GCIU-Employer Retirement Fund v. Quad/Graphics, Inc.*[109]  In that case, the withdrawing employer challenged the pension plan's calculation of its withdrawal liability on the grounds that it had not applied one of the partial withdrawal reductions before applying the 20-year cap.[110]  The Ninth Circuit held that "[s]ection 1381(b)(1) plainly dictates the order of operations in calculating withdrawal liability."[111]

---

[106] 29 U.S.C. § 1381(b)(1)(A)-(D); *GCIU-Employer Retirement Fund v. Quad/Graphics, Inc.*, 909 F.3d 1214, 1218 (9th Cir. 2018); *Perfection Bakeries v. Retail Wholesale and Department Store International Union and Industry Pension Fund*, No. 2:22-cv-573, 2023 WL 4412165 (N.D. Ala. July 7, 2023).

[107] *See* 29 U.S.C. § 1381(b)(1)(D).

[108] *Id.*

[109] 909 F.3d at 1214.

[110] *Id.* at 1218.

[111] *Id.* at 1219.  *See also Perfection Bakeries*, 2023 WL 4412165, at *3 ("After calculating the allocable amount of unfunded vested benefits, the plan sponsor then applies four potential adjustments to that number, *in sequential order*, to reach the employer's withdrawal liability.") (emphasis added).

In seeking to distinguish that reasoning, Central States points to a wrinkle in the statutory language of § 1405 that was not applicable in *GCIU-Employer Retirement Fund*.[112] Section 1405(a)(1) specifically states, in a parenthetical, that the provision applies "after the application of all sections of this *part* having a lower number designation than this *section*."[113]

The architecture of the United States Code is as follows:

Titles
    Chapters
        Subchapters
           Subtitles
                Parts
                    Sections

Section 1405(a)(1) is located in part I of subtitle E of subchapter III of chapter 18 of title 29. Part I is comprised of §§ 1381 through 1405. Accordingly, all of the three prior adjustments contemplated by § 1381 – the ones required by §§ 1389, 1386, and 1399(c)(1) – are in sections of part I that "have a lower number designation" than 1405.

In substance, Central States' argument is that one should draw a negative inference from the parenthetical in § 1405(a)(1). Because § 1405(b) contains no such parenthetical, Central States argues that § 1405(b) therefore does *not* require one to apply the other three sections' reductions before one applies § 1405(b). That is incorrect.

---

[112] D.I. 5376 at 18-19.

[113] <u>29 U.S.C. § 1405(a)(1)</u> (emphasis added).

To be sure, Central States is correct that as a general matter one ought to read a statute so that every provision has independent meaning, and no provision is rendered superfluous. But the "canon against superfluity assists only where a competing interpretation gives effect to every clause and word of a statute."[114] The problem with Central States' position is that it just cannot be squared with the import of 29 U.S.C. § 1381, which clearly sets forth an order of operations. It is for precisely this reason that the Supreme Court has repeatedly pointed out that the canon against superfluity "is not an absolute rule."[115] Accordingly, the Court views the parenthetical reference in § 1405(a)(1) as simply clarifying the point that would otherwise apply, by virtue of § 1381, even had the parenthetical been omitted. As such, there is no basis for reading the statute to conclude that the reductions specified in 29 U.S.C. § 1405(b) should be applied before the other adjustments.

### 2. The debtors' positions are not contrary to the law of the case.

Section 1405(b) states that the "unfunded vested benefits" are reduced, using the formula set forth in the statute, to calculate the employer's "withdrawal liability." In an earlier opinion, the Court addressed the question of what amount would be accelerated under § 1399(c)(5), in the event of default in the payment of withdrawal

---

[114] *Microsoft Corp. v. I4I Ltd. Partnership*, 564 U.S. 91, 106 (2011) (internal quotations omitted).

[115] *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013). *See also King v. Burwell*, 576 U.S. 473, 491 (2015) ("our preference for avoiding surplusage constructions is not absolute"); *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 299 n.1 (2006) ("While it is generally presumed that statutes do not contain surplusage, instances of surplusage are not unknown."); *Lamie v. United States Trustee*, 540 U.S. 526, 536 (2004) (same).

liability.  That section refers to an acceleration of the "withdrawal liability."[116]  The Court accordingly rejected the plans' argument that the amount that was accelerated was the full amount of the allocable share of unfunded vested benefits.  The statutory reference to "withdrawal liability" meant the liability *after* the application of the reductions set forth in § 1381, including the 20-year cap provided in § 1399(c)(1).[117]

From that statement, certain plans argue that the law of the case thus requires that every reference in § 1405 to a reduction in "unfunded vested benefits" means the amount of unfunded vested benefits *before* any of other steps specified in § 1381.[118]  But that cannot be right.  The whole point of § 1381 is to specify a series of adjustments to unfunded vested benefits that must be made in order to reach the end result – the employer's withdrawal liability.  It would defeat the point of Congress' clearly articulated order of operations to treat each reference to "unfunded vested benefits" as meaning the original calculation of the unfunded vested benefits, rather than the amount as adjusted by the earlier steps in the process.  Nothing at all in the Court's prior opinion is inconsistent with that commonsense point.  The doctrine of law of the case accordingly does nothing to support the plans' argument.

---

[116] 29 U.S.C. § 1399(c)(5).

[117] D.I. 4769 at 37.

[118] D.I. 5376 at 17-18.

## VI. Central States and Local 641 used inappropriate contribution rates when calculating the debtors' withdrawal liability.

The debtors argue that two pension plans, Central States and Local 641, inappropriately included post-2014 contribution rate increases into their calculation of the debtors' annual payment.[119]

ERISA establishes certain thresholds, and accompanying obligations, that correspond to the financial health of a multiemployer defined benefit pension plan.[120] Plans are either (1) not graded (*i.e.*, healthy); (2) endangered or seriously endangered; (3) critical; or (4) critical and declining.[121] Once a plan enters critical status under 29 U.S.C. § 1085(a)(2) it is required to adopt a so-called "rehabilitation plan."[122] In practice, this means that the plan must either (1) increase employer contributions such that the plan will be able to emerge from "critical status" within 10 years of its critical status designation; or (2) implement other reasonable methods to emerge from critical status if the plan does not reasonably believe it will be able to emerge within 10 years of its initial designation.[123]

In 2014, Congress amended ERISA to address certain solvency issues facing some of the nation's largest multiemployer pension plans.[124] An employer's level of

---

[119] D.I. 5217 at 43.

[120] *See* Cong. Rsch. Serv., R47512, Data in Brief: Funding Status of Multiemployer Denied Benefit Pension Plans 3 (2023).

[121] *Id.*; 29 U.S.C. § 1085.

[122] 29 U.S.C. § 1085(e).

[123] *Id.* § 1085(e)(3)(A).

[124] *See* Cong. Rsch. Serv., R43305, Multiemployer Denied Benefit (DB) Pension Plans: A Primer 1 (2020); *see also Central States, Southeast and Southwest Areas Pension Fund v.*

plan contributions is a significant factor in calculating withdrawal liability. The 2014 amendments made certain changes to that calculation. One of the changes requires that increases in an employer's plan contributions that were made to help the plan meet its rehabilitation plan requirements would not increase the employer's withdrawal liability.[125]

Congress effectuated the exclusion of contribution rate increases owing to a plan's rehabilitation status in 29 U.S.C. § 1085(g)(3). Section 1085(g)(3)(A) establishes a general rule that excludes from the calculation of withdrawal liability *any* increase in the contribution rate that must be made to meet the requirements of a rehabilitation plan unless the increases were "due to increased levels of work, employment, or periods for which compensation is provided."[126]

Section 1085(g)(3)(B) provides "special rules" used to determine whether an increase in contribution rates was on account of the need to meet the rehabilitation plan's funding status. That section states, subject to one exception, that "*any* increase in the contribution rate … *shall be deemed* to be required" to meet the plan's rehabilitation plan status.[127] The only statutory exception is for "increases in contribution requirements due to increased levels of work, employment, or periods

---

*Laguna Dairy*, 23-3206, 2025 WL 923761, at *4 (3d Cir. March 27, 2025) ("[T]he [general] purpose of the [Multiemployer Pension Plan Amendments Act] is to ensure the solvency of multiemployer pension plans.").

[125] *Id.* at 25; 29 U.S.C. § 1085(g)(3).

[126] 29 U.S.C. § 1085(g)(3)(A); *see also*, *Central States, Southeast and Southwest Areas Pension Fund v. McKesson Corp.*, No. 23-cv-16770, 2025 WL 81358, at *3-*5 (N.D. Ill. Jan. 13, 2025).

[127] 29 U.S.C. § 1085(g)(3)(B) (emphasis added).

for which compensation is provided or additional contributions are used to provide an increase in benefits, *including an increase in future benefit accruals, permitted by subsection* (d)(1)(B) *or (f)(1)(B).*"[128] The italicized language is critical. Because the parties agree that the only increases at issue come from increases in benefit accruals, the increase *must* be permitted by either subsection (d)(1)(B) or (f)(1)(B) to fit within the exception.

Subsection (d)(1)(B) is not applicable here. Subsection (f)(1)(B) says that in order to pay increased benefits, a plan must amend its plan documents and have its actuary certify that (1) the increased benefits are being paid out of additional contributions that are not contemplated by the rehabilitation plan, and (2) the benefit increase will not delay the plan's anticipated emergence from rehabilitation status.[129]

Central States argues that the contribution rate it used to calculate the debtors' annual payment was appropriate because none of the "rate increases were required by (or made in compliance with)" Central States' rehabilitation plan status.[130] This argument fails in the face of the plain statutory language.

Central States contends that "every post-2014 rate increase was used to provide an increase in benefits by virtue of Central States Pension Fund's long-standing benefit accrual formula, whereby a participant earns a monthly benefit equal to 1% of all contributions made on their behalf."[131] Central States adds that

---

[128] *Id.* (emphasis added).

[129] *Id.*

[130] D.I. 5376 at 21.

[131] *Id.* at 22.

"[u]nder this formula, every contribution rate increase paid by an employer leads to increased benefit accruals for its employees."[132]

The difficulty with this argument, however, is that the statute makes plain that if the increase results from an increase in future benefit accruals, then it will not count toward the calculation of withdrawal liability unless the plan complies with § 1085(f)(1)(B). That provision would require that any increase be the result of an amendment to the plan documents, which amendment may only be made if the actuary certifies that the increase will not interfere with or delay the plan's rehabilitation.[133] The record in this case makes clear that neither Central States nor Local 641 made any such change to its plan documents.

The Court thus concludes that Central States and Local 641 did not properly exclude post-2014 contribution rate increases when calculating the debtors' withdrawal liability.

---

[132] *Id.* Local 641 makes essentially the same point. D.I. 5378 at 12. Local 641 correctly pointed out that it had raised this substantive argument in their brief during the initial round of withdrawal liability litigation and that the debtors failed to respond in their reply. Local 641, however, did not raise the issue again in further briefing or at oral argument. D.I. 5588 at 98. Given the number of complex issues were litigated at that stage, the Court believes it appropriate to consider all parties' arguments and resolve this issue on the merits.

[133] 29 U.S.C. § 1085(f)(1)(B) ("A plan may not be amended after the date of the adoption of a rehabilitation plan under subsection (e) so as to increase benefits, including future benefit accruals, unless the plan actuary certifies that such increase is paid for out of additional contributions not contemplated by the rehabilitation plan, and, after taking into account the benefit increase, the multiemployer plan still is reasonably expected to emerge from critical status by the end of the rehabilitation period on the schedule contemplated in the rehabilitation plan.").

## VII. The liquidated damages provision contemplated in the 2014 letter agreement is an unenforceable penalty under Illinois law.

In 2014 the parties entered into an agreement relating to Yellow's 2011 deferral of its contribution to Central States.[134] The 2014 agreement, formally titled "Guarantee of Continued Participation," provides that Yellow would continue to participate in the Central States plan for 10 years after it fully paid off the amounts it had deferred.[135] Yellow completed those payments in January 2023, and withdrew from the Central States plan in July 2023 when it ceased its business operations.[136]

The letter agreement contains a damages provision that, on the facts presented here, contemplates nearly a billion dollars in damages.[137] The parties filed cross motions for summary judgment as to the enforceability of the liquidated damages provision. While the parties' arguments address several different issues, the Court concludes that this liquidated damages provision is an unenforceable penalty clause. The Court accordingly need not consider the debtors' various other challenges to the enforcement of the agreement.

There is no dispute that Illinois law is applicable to the construction and enforcement of the letter agreement. And under Illinois law, when the "sole purpose of [a liquidated damages provision] is to secure performance of the contract, the

---

[134] D.I. 5217-5 at 369 of 823 (Ex. 41). The debtors refer to the letter agreement as the "2014 Guarantee Letter." D.I. 5181 at 10. Central States refers to it as the "2014 Letter Agreement." D.I. 5460 at 13. The Court will refer to the document as either the "letter agreement" or the "2014 letter agreement."

[135] D.I. 5181-11 at 137 of 468 (Central States' Proof of Claim No. 4336).

[136] *Id.* at 103 of 468.

[137] *Id.* at 137 of 468.

provision is an unenforceable penalty."[138]  That principle is consistent with the broader contract law policy that "[p]unishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy."[139]

Illinois courts have incorporated the Restatement's test to determine whether a damages provision in a contract operates as an impermissible penalty.[140]  Courts generally ask whether (1) the parties "intended to agree in advance to the settlement of damages;" (2) the amount of damages "was reasonable at the time of contracting" and bears "some relation to the damages which might be sustained;" and (3) actual damages would "be uncertain in amount and difficult to prove."[141]  Illinois law also permits courts to take account of other (unspecified) factors, as the caselaw explains that "each [liquidated damages provision] must be evaluated on its own facts and circumstances."[142]

A reading of the 2014 letter agreement evidences a singular purpose: to make it more expensive for Yellow to withdraw from the Central States plan.  The debtors' core obligation under the letter agreement is that they "continue to participate in and pay contributions to the Pension Fund pursuant to collective bargaining agreements

---

[138] *River East Plaza v. Variable Annuity Life Ins. Co.*, 498 F.3d 718, 722 (7th Cir. 2007) (applying Illinois law).

[139] RESTATEMENT (SECOND) OF CONTRACTS § 356 COMMENT A.

[140] *GK Development, Inc. v. Iowa Malls Financing Corp.*, 3 N.E.3d 804, 817 (Ill. App. Ct. 2013); *Jameson Realty Grp. v. Kostiner*, 813 N.E.2d 1124, 1130 (Ill. App. Ct. 2004).

[141] *GK Development, Inc.*, 3 N.E.3d at 817.

[142] *Jameson Realty Grp.*, 813 N.E.2d at 1130 (internal quotations and citations omitted).

for a period of not less than ten (10) full years" after they paid off the deferred contribution amounts.[143] There are, to be sure, other requirements. But none of them imposes additional substantive compliance obligations on the debtors.[144] Read in that context, the only practical purpose of the letter agreement was to require Yellow to pay additional damages in the event of a withdrawal.

One could, perhaps, have a conversation about whether the statutory right to withdrawal liability under ERISA fully compensates Central States for the economic harm associated with Yellow's withdrawal. And one could certainly argue that to be in the same economic position in which Central States would have been had Yellow continued its participation in the Central States plan until 2033, Yellow would need to pay more than just its statutory withdrawal liability. But even so, the liquidated damages formula provided by the letter agreement neither takes account of the withdrawal liability claim to which Central States is entitled nor reduces the amount owed on account of the fact that Yellow's employees will no longer accrue benefits. As such, one cannot say that the liquidated damages provision bears any rational relationship to the damages that Central States will suffer on account of a breach, or even that it reflects any effort to do so.

---

[143] D.I. 5181-11 at 136-142 of 468.

[144] *See generally*, *id.* Emails between Central States and representatives for Yellow further indicate that the sole purpose of the 2014 letter agreement was to ensure that Yellow continue to participate in the Central States pension plan. D.I. 5169-10, 11. The formal name of the agreement, "Guarantee of Continued Participation" is also instructive. D.I. 5181-11 at 137 of 468.

The only conclusion, then, is that the liquidated damages provision was primarily intended to secure debtors' continued participation in the plan. The Court thus concludes that the liquidated damages provision contained in the 2014 letter agreement is an invalid penalty under Illinois law.

## Conclusion

For these reasons, to the extent the Court determines that, should it proceed towards resolution of the claims allowance dispute, the debtors' motion for summary judgment would be granted in part and denied in part, as would be those of the various pension plans. To the extent the Court concludes that it may take up plan confirmation without adjudicating the claims allowance disputes, the debtors and the Committee should be prepared to demonstrate, at confirmation, the reasonableness of the settlements proposed in the plan (under whatever standard is deemed to be applicable) in view of these conclusions.

Dated: April 7, 2025

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER RELATING TO MULTIEMPLOYER PENSION PLAN
## MOTIONS FOR SUMMARY JUDGMENT

The Court has considered certain motions for summary judgment filed by the Debtors, SFA MEPPs, and certain non-SFA MEPPs (the "MSJs") [Docket Nos. 4184, 5162, 5165, 5166, 5175, 5181] and responses and objections thereto; and the Court having held a hearing on the MSJs on January 28, 2025; and the Court having issued a memorandum opinion of preliminary observations regarding the MSJs [Docket No. 6030]; and the district court having jurisdiction under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that venue of this proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1. Partial summary judgment is granted to Local 705 Pension Fund on its *Motion for Summary Judgment* [Docket No. 4184] for the reasons set forth in the *Memorandum Opinion Setting Forth Preliminary Observations on Remaining Multiemployer Pension Plan Claims*

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

*Allowance Disputes* [Docket No. 6030].

    2.    The *Teamsters Pension Trust Fund of Philadelphia & Vicinity's Motion for Summary Judgment* [Docket No. 5162] is granted in part and denied in part, for the reasons set forth in the *Memorandum Opinion Setting Forth Preliminary Observations on Remaining Multiemployer Pension Plan Claims Allowance Disputes* [Docket No. 6030].

    3.    The *Multiemployer Pension Plan's Supplemental Motion for Summary Judgment* [Docket No. 5165] is granted in part and denied in part, for the reasons set forth in the *Memorandum Opinion Setting Forth Preliminary Observations on Remaining Multiemployer Pension Plan Claims Allowance Disputes* [Docket No. 6030].

    4.    The *Central States Pension Fund's Motion for Summary Judgment on Its Withdrawal Liability and Contribution Guarantee Claims* [Docket No. 5166] is granted in part and denied in part, for the reasons set forth in the *Memorandum Opinion Setting Forth Preliminary Observations on Remaining Multiemployer Pension Plan Claims Allowance Disputes* [Docket No. 6030].

    5.    The *Funds' Motion for Partial Summary Judgment* [Docket No. 5175] is granted in part and denied in part, for the reasons set forth in the *Memorandum Opinion Setting Forth Preliminary Observations on Remaining Multiemployer Pension Plan Claims Allowance Disputes* [Docket No. 6030].

    6.    The *Debtors' Motion for Partial Summary Judgment on SFA MEPPS' and Non-SFA MEPPs' Claims* [Docket No. 5181] is granted in part and denied in part, for the reasons set forth in the *Memorandum Opinion Setting Forth Preliminary Observations on Remaining Multiemployer Pension Plan Claims Allowance Disputes* [Docket No. 6030].

    7.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

3

8.      This Court shall retain jurisdiction with respect to all matters arising from or related to the interpretation, implementation, or enforcement of this Order.

*[signature]*

**CRAIG T. GOLDBLATT**
**UNITED STATES BANKRUPTCY JUDGE**

**Dated: July 18th, 2025**
**Wilmington, Delaware**

4